BROTHERHOOD OF RAILROAD TRAINMEN, EN-
TERPRISE LODGE, NO. 27, ET AL. *v.* TOLEDO,
PEORIA & WESTERN RAILROAD.

No. 28. Argued November 9, 10, 1943.—Decided January 17, 1944.

*Mr. John E. Cassidy* for petitioners.

*Mr. Clarence W. Heyl,* with whom *Mr. John M. Elliott* was on the brief, for respondent.

Mr. Justice Rutledge delivered the opinion of the Court.

The important question is whether the District Court properly issued an injunction which restrained respondent's employees, conductors, yardmen, enginemen and firemen, from interfering by violence or threats of violence with its property and interstate railroad operations. The sole issues that concern us are the existence of federal jurisdiction and whether the requirements of the Norris-La-Guardia Act (29 U. S. C. §§ 107, 108, 47 Stat. 71, 72) were satisfied.

The case arises out of a long-continued labor dispute relating to working conditions and rates of pay. Negotiations between the parties, beginning in October, 1940, failed. A long course of mediation, with the aid of the National Mediation Board, resulted likewise. Accordingly, on November 7, 1941, the mediator proposed arbitration pursuant to the Railway Labor Act's provisions. 45 U. S. C. § 155, First (b), 48 Stat. 1195. Both parties refused. Thereupon, as the Act requires, the Board terminated its services. *Ibid.* This occurred November 21, 1941. Under the statute, no change in rates of pay, rules, working conditions or established practices can be made for thirty days, unless in that time the parties agree to arbitration or an emergency board is created under § 10. *Ibid.* Anticipating respondent would put into effect its proposed schedules at the end of the period, the employees voted

to strike. The time for stopping work was set for December 9 at 11:00 a. m. Respondent knew of the voting on or before December 6, but did not receive formal notice of the strike until about noon of December 8.

With the bombing of Pearl Harbor on December 7, the Mediation Board again intervened, strongly urging both sides to settle the dispute in view of the national emergency. At the Board's request the employees had postponed the strike indefinitely.[1] Further conferences failed to bring agreement and on December 17 the Board again urged that the disputants agree to arbitration under the statute. This time the employees accepted.[2] But respondent continued its refusal, though it also continued to urge the appointment of an emergency board. And, while the record does not show that respondent was notified formally of the employees' agreement to arbitrate until December 28, neither does it appear that respondent did not know of this fact before that time.

On December 21, exactly the expiration of the thirty-day period, respondent by letter notified the employees and their representatives that its proposed schedules would become effective at 12:01 a. m., December 29. By letter dated December 27 and received by respondent before noon on December 28, the employees served notice that a strike would take effect December 28 at six o'clock in the evening. By wire which respondent received that day, the Board

---

[1] Petitioners' brief characterizes their action as agreement "to an indefinite postponement." Respondent says "the strike notice was at no time withdrawn, although it was temporarily withheld" until December 28.

[2] The record does not disclose the exact time or manner of petitioners' agreement, but clearly indicates it was in response to this proposal of the Board, not the later one of December 28, which was addressed solely to respondent and recited the employees' previous agreement.

again strongly urged arbitration, pointing out the employees had acceded to the Board's request. Respondent again declined and urged an emergency board be appointed.

The strike took effect at the appointed time. Picket lines were formed. Respondent undertook to continue operations with other employees. It employed "special agents" to protect its trains and property.[3] Clashes occurred between them and the working employees, on the one hand, and the striking employees on the other. Various incidents involving violence or threats of violence took place. Some resulted in personal attacks, others in damage to property and interruption of service. The respondent sought the aid of public authorities, including the sheriffs of counties along its right of way and police authorities in cities and towns which it served. Some assistance was offered, but in some instances the authorities replied they had forces inadequate to supply the aid respondent requested and in others no reply was given. The parties are at odds concerning the extent of the violence, the need for public protection, and the adequacy of what was supplied or available. But the findings of the District Court are that the violence was substantial and the protection supplied by the public officials was inadequate. These incidents took place through the period extending from December 29, 1941, to January 3, 1942.

On the latter date respondent filed its complaint, asking for a temporary restraining order and, after hearing, an injunction restraining petitioners from interfering with its operations and property. The restraining order issued *ex parte* the same day, respondent giving bond as required (29 U. S. C. § 107, 47 Stat. 71–72) for indemnity against loss occasioned by its improvident or erroneous issuance.

---

[3] There were twenty-nine of these. The employees involved in the dispute numbered about one hundred.

Hearing on the application for a temporary injunction began January 8 and continued to January 19. Two extensions continued the restraining order in force until the hearing was completed. Petitioners moved to vacate the extensions on January 15 and again at the close of the hearing on January 19, and to dismiss the complaint. These motions were denied, and the court made findings of fact and conclusions of law sustaining respondent's contentions. Thereupon the temporary injunction issued. In due course appeal was perfected from the order for its issuance and the previous orders denying petitioners' various motions to vacate the extensions and to dismiss the complaint. The Circuit Court of Appeals, one judge dissenting, affirmed the judgment. 132 F. 2d 265. We granted certiorari because of the importance of the issues presented. 318 U. S. 755.[4]

Three principal issues have been made in the lower courts and here. Stated in the form of petitioners' contentions, they are: (1) The District Court was without jurisdiction, since there is no claim of diversity of citizenship and, it is said, no federal question is involved;[5] (2) the

---

[4] It may be added to the background of facts that, between January 19, when the injunction issued, and the time when the appeal was perfected, various individual defendants, petitioners here, were cited to show cause why they should not be punished for contempt for violating the injunction. The court also issued an order on February 9 directing the marshal to enforce the injunction by proper means, including the employment of additional deputies if necessary. The record shows the citations were set for hearing but does not disclose what disposition was made of them. It appears, however, from the briefs that the persons cited were convicted and sentenced for violation of the injunction, sentence later being suspended pending the final determination of this case.

[5] In the lower courts and here this issue was highly controverted. Petitioners say jurisdiction is lacking since the cause of action is one

evidence was not sufficient to show that the public authorities were unwilling or unable to furnish adequate protection for respondent's property;[6] and (3) respondent did not make every reasonable effort to settle the dispute as required by the Norris-LaGuardia Act.[7] Without passing upon the others, we think the last contention must be sustained.

Section 8 of the Norris-LaGuardia Act (29 U. S. C. § 108, 47 Stat. 72) provides:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by

---

merely for exercise of the general police power in the protection of the railroad's property. The complaint, it is said, does not specify any provision of federal law which requires construction or application and does no more than aver a general reference to federal statutes, including the Interstate Commerce Act and the statute making criminal specified interferences with interstate railroad property. 18 U. S. C. § 412 (a); cf. *Cohens* v. *Virginia,* 6 Wheat. 264; *Norton* v. *Whiteside,* 239 U. S. 144; *Niles-Bement-Pond Co.* v. *Iron Moulders Union,* 254 U. S. 77; *Gully* v. *First National Bank,* 299 U. S. 109.

Respondent and the lower courts find the jurisdictional basis generally in the duties imposed upon carriers by the Interstate Commerce Act and other federal statutes, including the criminal statute referred to above. They rely upon such authorities as *In re Lennon,* 166 U. S. 548; *Toledo, A. A. & N. M. Ry. Co.* v. *Pennsylvania Co.,* 54 F. 730 (C. C. N. D. Ohio); and *Wabash R. Co.* v. *Hannahan,* 121 F. 563 (C. C. E. D. Mo.).

[6] Cf. the Norris-LaGuardia Act, 29 U. S. C. § 107 (e), 47 Stat. 71.

[7] Petitioners also urge that the temporary restraining order became void on the expiration of five days by the provisions of 29 U. S. C. § 107 (e), and could not be extended beyond that time; hence the orders continuing it in force were nullities; and that the evidence was insufficient to show they had participated in or ratified any act of violence or of interference with respondent's operations or property.

negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

The question, broadly stated, is whether respondent made "every reasonable effort" to settle the dispute, as the section requires. On the facts this narrows to whether its steadfast refusal to agree to arbitration under the Railway Labor Act's provisions made the section operative. We think it did, with the consequence that the federal courts were deprived of the power to afford injunctive relief and respondent was remitted to other forms of legal remedy which remained available.[8]

Respondent was subject to the Railway Labor Act. Its provisions and machinery for voluntary arbitration were "available." Resort to them would have been a "reasonable effort to settle" the dispute. Clearly arbitration under the Act was a method, both reasonable and available,[9] which respondent refused to employ, not once, but repeatedly and adamantly. If it had been used, it would have averted the strike, the violence which followed, and the need for an injunction.[10]

Section 8 demands this method be exhausted before a complainant to whom it is available may have injunctive relief. Broadly, the section imposes two conditions. If a complainant has failed (1) to comply with any obligation imposed by law or (2) to make every reasonable

---

[8] Cf. text *infra* at note 21.

[9] Cf. 45 U. S. C. § 157, 44 Stat. 582–584, 48 Stat. 1197. Each party selects an equal number of arbitrators who select another or others, but in case of failure of the named arbitrators to agree the Mediation Board selects the additional member or members.

[10] The award is made final and conclusive upon the parties, except for possible impeachment of the judgment entered upon it, in judicial proceedings, on grounds specified in the statute. 45 U. S. C. § 158 (l), (m), (n), 44 Stat. 584–586, 48 Stat. 1197; § 159, Second, Third, 44 Stat. 585.

effort to settle the dispute, he is forbidden relief. The latter condition is broader than the former. One must not only discharge his legal obligations. He must also go beyond them and make all reasonable effort, at the least by the methods specified if they are available, though none may involve complying with any legal duty. Any other view would make the second condition wholly redundant. It clearly is not the section's purpose, therefore, by that condition, to require only what one is compelled by law to do. Yet, as will appear, this would be the effect of accepting respondent's position.

It is wholly inconsistent with the section's language and purpose to construe it, as have respondent and the lower courts, to require reasonable effort by only one conciliatory device when others are available. The explicit terms demand *"every* reasonable effort"* to settle the dispute. Three modes are specified.[11] They were the normal ones for settlement of labor disputes by the efforts of the parties themselves and the aid of agencies adapted specially for the purpose. The Railway Labor Act [12] pro-

[11] It is not necessary to determine whether they are illustrative or exclusive. Respondent's emphasis upon the disjunctive meaning of "either . . . or . . . or" effectually eliminates "every" from the section. It distorts "every reasonable effort" into meaning, in effect, "one of the following reasonable efforts." A similar distortion is its apparent view that the phrase "with the aid of any available governmental machinery" qualifies only "mediation" and not "voluntary arbitration." Cf. the further discussion in the text, *infra* at note 20. And if the section uses "or" only in the disjunctive, it would be enough either to comply with legal obligations or to make reasonable effort, a view so obviously untenable it has not been suggested.

[12] The Norris-LaGuardia Act was adopted March 23, 1932. 47 Stat. 70. At that time the Railway Labor Act of 1926 was in force. 44 Stat. 577. Though it differed in substantial respects from the Railway Labor Act of 1934, now in effect (48 Stat. 1185), it contained provisions for the three procedures of negotiation, mediation and arbitration which, for present purposes, were identical with or substan-

vided for all of them, with the aid of governmental machinery in the stages of mediation and arbitration. Section 8 is not limited to railway labor disputes. But it includes them.[13] And its very terms show they were used in explicit contemplation of the procedures and machinery then existing under the Railway Labor Act and with the intent of making their exhaustion conditions for securing injunctive relief, not singly or alternatively, but conjunctively or successively, when available. This purpose of Congress is put beyond question when the section's legislative history is considered in the light of the history and the basic common policy of the two statutes, the Railway Labor Act and the Norris-LaGuardia Act.

The policy of the Railway Labor Act was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes. Cf. *General Committee of Adjustment* v. *Missouri-Kansas-Texas R. Co.*, 320 U. S. 323; *General Committee of Adjustment* v. *Southern Pacific Co.*, 320 U. S. 338. The over-all policy of the Norris-LaGuardia Act was the same. The latter did not entirely abolish judicial power to impose previous restraint in labor controversies. But its prime purpose was to restrict the federal equity power in such matters within greatly narrower limits than it had come to occupy.[14] It sought to make injunction a last line

---

tially similar to those of the later statute. The 1934 changes related principally to the machinery for making the procedures effective, though in some instances it more definitely crystallized legal obligations.

[13] Much of the debate in Congress related to previous railway labor disputes, including the Pullman controversy of 1894 and the shopcraft strike of 1922, and to decisions relating to injunctions which had been issued in connection with these disputes, e. g., *In re Debs*, 158 U. S. 564; cf. 75 Cong. Rec. 4618–4620, 5472–5479, 5503–5504.

[14] Cf. the debates in Congress, 75 Cong. Rec. 4505–4510, 4618–4626, 5462–5515.

of defense, available not only after other legally required methods, but after all reasonable methods as well, have been tried and found wanting. This purpose runs throughout the Act's provisions. It is dominant and explicit in § 8. In short, the intent evidenced both by words and by policy was to gear the section's requirements squarely into the methods and procedures prescribed by the Railway Labor Act.

Short reference to the legislative history makes this plain. There was extended discussion of the bill in the Congressional debates, a considerable part relating to the Railway Labor Act's provisions and operation.[15] No one suggested that the bill and that Act were not to be meshed in operation or that compliance with only one of the methods prescribed in § 8 would satisfy its requirement of "reasonable effort." On the contrary, it seems to have been taken for granted that exhaustion of all is demanded. Numerous proposals for amendment in other respects were made, but there were none for changing this requirement. And Representative LaGuardia, who sponsored the bill in the House, after quoting and discussing provisions of the Railway Labor Act of 1926, quoted § 8 and said, without challenge to his construction:

"So that *there is the tie-up* between the provisions of the railroad labor act and the necessity of exhausting *every remedy* to adjust any difference which might arise. The workers could not and would not think of going on strike before *all the remedies provided in the law* have been exhausted. *If the railroads have complied,* they would not, as has been suggested [by Representative Beck], be deprived of any relief which they may have in law or equity." (Emphasis added.)[16]

---

[15] Cf. notes 13, 14 *supra.*

[16] 75 Cong. Rec. 5504. And, at 5508, in response to an inquiry whether or not § 8's requirements would apply where it might be im-

Representative O'Connor, supporting the sponsor's view, characterized § 8 as "the 'clean hands' provision" and said:

"That section provides that a complainant shall not be entitled to an injunction if he has not complied with any contract or obligation on his part or has not made every reasonable effort to settle the dispute by the available methods of arbitration or mediation. Surely, this fundamental principle of equity that 'he who seeks justice must do justice' should apply in labor disputes as well as in other judicial controversies." [17]

To construe the section therefore as requiring but one of the three methods to be used, when the other two are equally available, would emasculate the language and would defeat the purpose and the policy of the statute.

It would do this by inviting semblance of compliance without its substance, motion of settlement without progress toward it. In railway disputes, the first short step in the succession provided by the Railway Labor Act could be taken and the remainder then could be hurdled by injunction. A party always could negotiate, that is, en-

possible to move for settlement by negotiation, mediation or arbitration, he stated:

"The answer to that is simple. In seeking a restraining order a party believed to be aggrieved comes into court and under a certain state of facts, which are enumerated in the bill itself, asks for a restraining order. *If time has not permitted him* or the corporation *to avail itself of the existing governmental machinery* for the settlement of a labor dispute, he recites that as one of his facts, which is full compliance, of course, with the provisions of section 8, *which makes it a condition precedent that every remedy must be exhausted* to settle the strike before the injunction will issue." (Emphasis added.)

[17] 75 Cong. Rec. 5464. It was partly for fear of the effects of requiring compliance with § 8's provisions, upon interruption of service, that Mr. Beck, who led opposition to the bill, urgently advocated an amendment exempting public utilities. 75 Cong. Rec. 5503–5504.

gage in collective bargaining,[18] and thereby be relieved of the requirements, under § 8, of mediation and arbitration. Thus, in this case, under the construction of the Court of Appeals, when respondent completed negotiations without the aid of mediation, there was no need to go on with mediation. In the court's view compliance with one of the specified methods satisfies the full requirements of § 8.[19] Yet negotiation, in the sense of bargaining collectively, under the Railway Labor Act is an obligation imposed by law. Section 2, Ninth; also First, Second; *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515, 548; cf. *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548; *General Committee of Adjustment* v. *Missouri-Kansas-Texas R. Co.,* 320 U. S. 323, 330–332. Obviously, if the view of the Court of Appeals is right, the condition requiring "every reasonable effort to settle" the dispute becomes a dead letter in railway labor disputes, since no more would be required by its terms in that application than is called for by the first condition which demands compliance with legal obligations. Respondent, however, while apparently agreeing with the Court of Appeals that compliance with one method is sufficient, relies not only upon its negotiation, but also upon its participation in mediation. This serves it in no better stead. The section is not disjunctive as to arbitration, but conjunctive as to negotiation and mediation. The case is one, so far as both language and policy go, of one or all.[20]

---

[18] It may be assumed that the negotiation must be done in good faith, as is true under the National Labor Relations Act, cf. e. g., *Labor Board* v. *Pilling & Son Co.,* 119 F. 2d 32 (C. C. A.).

[19] "The employer is not compelled to avail himself of all three methods; any one of them will fulfill the requirements. Thus in *Mayo* v. *Dean,* 82 F. 2d 554, 556 [C. C. A.] it was held that the employer is not obliged to propose both mediation and arbitration." 132 F. 2d 265, 271.

[20] Cf. note 11 *supra.*

Respondent's final contention, in this phase of the case, is the most insistent. It is that if "voluntary arbitration," as the term is used in § 8, encompasses arbitration under the Railway Labor Act, by that fact the arbitration ceases to be "voluntary" and the latter Act's requirement that it be so is violated. In short, it is said the effect is to force respondent to submit to compulsory arbitration.

Without question, as respondent says, arbitration under the Railway Labor Act is voluntary. Section 7, First, requires the machinery to be put in motion by agreement of the parties. A proviso also declares, "That the failure or refusal of either party to submit a controversy to arbitration shall not be construed as a violation of any legal obligation imposed upon such party by the terms of this Act or otherwise." 45 U. S. C. § 157, First. It is clear, therefore, that the Railway Labor Act's purpose is not to impose upon the parties a legal duty to arbitrate, enforceable as is the duty to bargain collectively imposed by § 2, Ninth, discussed above. And if the effect of bringing that form of arbitration within the mandate of § 8 of the Norris-LaGuardia Act were to create such a duty, so enforceable, respondent's contention would be more in point. But it does not do that. And the contention that it does entirely misconceives the effect of § 7, First, of the Railway Labor Act, and confuses "violation" of its terms with failure to comply with those of § 8 of the Norris-LaGuardia Act. The proviso of § 7, First, and the requirement of submission by agreement were in force substantially in their present form under the Railway Labor Act of 1926. 44 Stat. 582. It was exactly in the light of these provisions and with the intent, as has been shown, to make it include arbitration under the Railway Labor Act that § 8 used the term "voluntary arbitration." Obviously there was no purpose in doing so to contradict the terms of both statutes and label "voluntary" what in fact is compulsory. Nor was this the effect. Section 7, First, merely

provides that failure to arbitrate shall not be construed as *a violation* of any legal *obligation* imposed upon the party failing by that Act or otherwise. Respondent's failure or refusal to arbitrate has not violated any obligation imposed upon it, whether by the Railway Labor Act or by the Norris-LaGuardia Act. No one has recourse against it by any legal means on account of this failure. Respondent is free to arbitrate or not, as it chooses. But if it refuses, it loses the legal right to have an injunction issued by a federal court or, to put the matter more accurately, it fails to perfect the right to such relief. This is not compulsory arbitration. It is compulsory choice between the right to decline arbitration and the right to have the aid of equity in a federal court.

True, this deprives respondent of a protection to which it might have been entitled if the condition had not been imposed. But that is true of each of the section's conditions. And it is hardly more true with respect to one condition than with respect to others. Mediation, or for that matter negotiation, does not become compulsory because without them or either of them injunctive relief cannot be had. Neither does arbitration.

Nor does it follow, as respondent seems to imply, that it is left without remedy. Other means of protection remain. Suits for recovery of damages still may be brought in the federal courts, when federal jurisdiction is shown to exist. Federal statutes supply criminal sanctions, enforceable in the federal courts, against persons who interfere in specified ways with the operation of interstate trains or destroy the property of interstate railroads. Cf. 18 U. S. C. § 412 (a). With these and other remedies that may be available we are concerned no further than to point out that respondent's failure to observe the requirements of § 8 has not left it without legal protection. That failure has deprived it merely of one form of remedy which the Congress, exercising its plenary control over the jurisdic-

tion of the federal courts,[21] has seen fit to withhold. With the wisdom of that action we have no concern. It is enough, for its enforcement, that it is written plain and does not transcend the limits of the legislative power. Cf. *Lauf* v. *Shinner & Co.*, 303 U. S. 323.

The fact is that respondent complied with the requirements of both § 8 and the Railway Labor Act in all but the one essential respect. It recognized the employees' designated representatives, negotiated with them, engaged in mediation until it was terminated by the Board as the statute required. When it came, however, to the final and crucial step of arbitration, it declined to go forward as § 8 requires if, later, injunctive relief is to be had. Whether the refusal was motivated by distrust of the Board,[22] by a desire to escape the binding effect of an award,[23] by preference for some other possible procedure,[24] or merely by re-

---

[21] Cf. *Lockerty* v. *Phillips,* 319 U. S. 182, and authorities cited.

[22] Respondent's brief contains the following:

". . . respondent had reached the point where its only recourse was to request *an impartial body,* namely: *an emergency board,* to hear the evidence and decide the issues involved.

"There is no presumption that this governmental agency would be fair, just and impartial, in the conduct of the arbitration, and with the experience which the respondent had had in the mediation, it could not be charged with bad faith in refusing to sign an arbitration agreement, where the arbitration proceedings were to be conducted under the same atmosphere.

"Respondent has always insisted upon a fair and impartial hearing of this labor dispute *before a body which has no connection with either the Brotherhood interests or the railroad interests,* and to this date it has been unsuccessful to have its case presented to a body of that character." (Emphasis added.)

[23] Cf. note 10 *supra;* note 24 *infra.*

[24] When the Mediation Board terminated its services, respondent first suggested submission to "some impartial fact-finding commission," but for advisory action only. Later it repeatedly urged appointment of an emergency board under § 10 of the Railway Labor Act, 45 U. S. C. § 160, 44 Stat. 586–587, 48 Stat. 1197. Under the section, if a

spondent's mistaken view of the section's requirements is not material. Arbitration under the Railway Labor Act was available, afforded a method for settlement Congress itself has provided, and until respondent accepted this method it had not made "every reasonable effort to settle" the dispute, as § 8 requires.

It remains to refute a further basis for the ruling of the Court of Appeals. This was that, in accordance with its previous decisions, § 8 does not apply when violence is involved. The terms of the section offer no support for such a view.[25] And, if exceptions exist, to find one in the circumstances shown by this record would be to invert the statutory order of things. The purpose of the section is to head off strikes and the violence which too often accompanies them, by requiring the statutory steps to be taken before the aid of federal courts is sought in equity. Denial of that assistance is the sanction the statute affords to secure performance of the prescribed preventive measures. To give it, when they have not been taken, not only violates the section's terms. It defeats the purposes they were to accomplish and which, when achieved, make unnecessary invocation of the court's aid.

In general the Act was not intended to interfere with the power to restrain violent acts.[26] And it was contemplated expressly the court might intervene to prevent them, when the particular circumstances show the complainant has had no opportunity to comply with such requirements as those of § 8.[27] But one major purpose of the Act was to prevent the use of injunction improperly as a strikebreaking imple-

---

dispute not adjusted threatens in the Board's judgment substantially to interrupt interstate commerce, the Board shall notify the President who, in his discretion, may create a board to investigate and report concerning the dispute.

[25] Frankfurter and Greene, The Labor Injunction (1930) 215.

[26] Cf. 75 Cong. Rec. 5478.

[27] Cf. note 16 *supra;* 75 Cong. Rec. 5508.

ment.[28]   And the discussion of § 8 in the Congressional debates shows that, while it would not apply if on the facts the complainant could not meet its terms, it was intended to apply when he had had ample opportunity but refused to do so.[29]   This is clear not only from Representative O'Connor's "clean hands" characterization of the section,[30] but also from the general character of the discussion regarding it.   Most, if not all, of the objection was upon the mistaken view that § 8 would apply even though the complainant might have no notice or knowledge of the facts calling for him to take the conciliatory steps before seeking injunctive relief.[31]   What has been said above shows this was not the intent or effect of the section.   There was indeed no expression of concern for the complainant who, having full opportunity to comply with the section, might refuse deliberately and steadfastly to do so.   On the contrary, it appears to have been understood clearly he would be remitted to other forms of relief not touched by the Act.

In view of the disposition we have made of the case, we have not determined the other issues which were presented. Some are of such importance they should not be decided in advance of necessity for determining them.   That necessity is not present in this case.   Accordingly, we express no opinion concerning those issues.

The judgment is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*Reversed.*

---

[28] Cf. 75 Cong. Rec. 5478.

[29] Cf. note 16 *supra;* 75 Cong. Rec. 5508.

[30] Cf. note 17 *supra* and text.

[31] Cf. 75 Cong. Rec. 4688, 5471, 5508, setting forth the objections of opponents to the bill, with the replies of its sponsors at 4760, 5508.