**CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY et al.,**
Plaintiffs-Appellees,

v.

**SWITCHMEN'S UNION OF NORTH AMERICA et al.,** Defendants-Appellants.

No. 387, Docket 26739.

United States Court of Appeals
Second Circuit.

Argued May 12, 1961.

Decided June 9, 1961.

Lee Leibik, Chicago, Ill. (Ruth Weyand, Washington, D. C. on the brief), for defendants-appellants.

Richard J. Flynn, Chicago, Ill. (Sidley, Austin, Burgess & Smith and Howard Neitzert, Chicago, Ill., and John E. Leach, Buffalo, N. Y., on the brief), for plaintiffs-appellees.

Francis R. Curry, Reilly, Curry & Gibbons, New York, N. Y., Clarence M. Mulholland, Mulholland, Robie & Hickey, Edward J. Hickey, Jr. and James L. Highsaw, Jr., Washington, D. C., for Railway Labor Executives Ass'n. as amicus curiae.

Before FRIENDLY and SMITH, Circuit Judges, and WATKINS, District Judge.*

FRIENDLY, Circuit Judge.

This appeal raises important questions as to the interrelations of the Railway Labor Act, 45 U.S.C.A. § 151 ff., and the Norris-LaGuardia Act, 29 U.S.C.A. § 101 ff.

The appeal, brought under 28 U.S.C. § 1292(a) (1), is by the Switchmen's Union, whose principal office is in Buffalo, and certain of its officers, from an order of the District Court for the Western District of New York granting a motion of appellee railways, operating primarily in western states, for a temporary injunction against a strike. The strike threat grew out of a "major" labor dispute over rates of pay. The dispute had progressed through all the stages provided for in the Railway Labor Act, including the expiration of thirty days after a report by an Emergency Board to the President as provided in § 10.

* United States District Judge for the Northern and Southern Districts of West Virginia, sitting by designation.

After a two day hearing, the District Court found that "At no time since the services of the notices of March 2 and March 20, 1959, have the defendants or any representatives of the defendants engaged in good faith efforts to reach final agreement with the Western Carriers' Conference Committee," with certain exceptions, and that "There are serious, substantial, difficult, and doubtful questions going to the merits of this case as to whether" defendants had complied with their statutory obligations to that end, imposed by § 2 First and Second of the Railway Labor Act. The Court found also, as is not denied, that a strike by the switchmen would cause irreparable injury to the plaintiff railways, as well as serious damage to the public and to other railway employees.

Appellants assert the injunction went beyond the Court's "jurisdiction" as limited by the Norris-LaGuardia Act, 29 U. S.C.A. §§ 101–115. Appellees deny this, and contend also that the scope of our review of this temporary injunction is limited to determining whether the District Court abused its discretion in deciding that plaintiffs had raised substantial questions requiring more deliberate investigation and that the harm plaintiffs would suffer from denial of the injunction outweighed any damage to defendants from its grant. Both sides claim their positions to be supported by pertinent decisions of the Supreme Court. The decisions do not speak to us with the clarion (but opposite) effect they do to the parties. Analysis of the statutes and the cases is needed to bring the issue into focus.

The Norris-LaGuardia Act of 1932 divides injunctive orders in labor disputes into two categories. Section 4 is a flat prohibition of certain types of injunctive orders—or, more accurately, it

would be if Norris-LaGuardia were to be read alone. Among these are orders against "(a) Ceasing or refusing to perform any work or to remain in any relation of employment"; "(g) Advising or notifying any person of an intention to do any of the acts heretofore specified"; "(h) Agreeing with other persons to do or not to do any of the acts heretofore specified"; and "(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified." Significantly, § 4 includes not only temporary and permanent injunctions but temporary restraining orders as well. Although § 4 alone would seem clear enough, § 5 adds that no court of the United States "shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in" § 4.

However, the list of prohibited orders in § 4 is far from being a complete catalogue of all the injunctive orders issuable in labor disputes. As to these others, § 7 imposes not a prohibition but limitations; the court shall not issue "a temporary or permanent injunction in any case involving or growing out of a labor dispute" except after hearing testimony in open court and unless the court makes specified findings, of which that most directly pertinent here is:

"(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, \* \* \*"

If substantiation of the distinction between the two sections were needed, the legislative history would furnish it in ample measure.[1]

---

1. Senator Blaine said the bill "limits this jurisdiction [of federal equity courts] both with reference to the situations in which injunctions may be issued and the procedure which must be followed." 75 Cong.Rec. 4626 (1932). As for § 4, he declared that "it provides among other things that the Federal courts are prohibited from issuing any injunctions enjoining workmen from striking, or from making their strike effective by peaceful means." The right to strike includes the right to seek the advice of union officials, to receive strike benefits, and to publicize

Six years earlier Congress had enacted the Railway Labor Act of 1926, c. 347, 44 Stat. 577. This contained, *inter alia,* the provisions for settlement of disputes by agreement mentioned above (§ 2), and also provisions for boards of adjustment to "hear and, if possible, decide" minor disputes [2] which the carriers and employees had agreed to refer (§ 3), for invocation of the services of a Board of Mediation (§§ 4, 5), and for the Presidential appointment of an Emergency Board (§ 10).

The debates on the Norris-LaGuardia Act indicate concern over its interrelation with the earlier Railway Labor Act. Representative Beck of Pennsylvania offered an amendment that would have excluded from Norris-LaGuardia labor disputes involving the suspension or discontinuance of a public utility whose operation was essential to property, health and life (75 Cong.Rec. 5503). The amendment was defeated, 75 Cong.Rec. 5505; but only on assurance from Representative LaGuardia that, at least as to railroads, it was unnecessary, since the Railway Labor Act "provides every detail for the settlement of disputes" and "The workers could not and would not think of going on strike before all the remedies provided in the law have been exhausted" (75 Cong.Rec. 5504).

Two years after the Norris-LaGuardia Act, Congress, in 1934, reenacted the Railway Labor Act with important amendments, c. 691, 48 Stat. 1185. Especially significant for understanding the Supreme Court decisions relied on by the parties were the addition of § 2 Ninth, providing for the National Mediation Board to certify the authorized representative of a class or craft of employees and requiring a carrier to treat with the representative so certified, and extensive amendment of § 3 giving either party the right to refer minor disputes to the Adjustment Board, § 3 First (i), and making the awards of the Board in such disputes "final and binding upon both parties to the dispute * * *," § 3 First (m).

Texas & N. O. R. Co. v. Brotherhood of Railway Clerks, 1930, 281 U.S. 548, 50 S.Ct. 427, 432, 74 L.Ed. 1034, the initial Supreme Court decision involving an injunction to enforce the Railway Labor Act, antedated Norris-LaGuardia. Such bearing as it has on the present controversy comes from the statement of Chief Justice Hughes, as a step in reaching the Court's conclusion, that the prohibition of § 10 against changes "in the conditions out of which the dispute arose," during study by and for thirty days after the report of an Emergency Board, "mani-

the facts in any peaceful manner; he referred to these rights "and everything else which sections 4 and 5 provide shall not be prohibited in any injunction involving or growing out of a labor dispute issued by any Federal court * * * In addition to these provisions relating to the content of injunctions this bill in section 7 sets forth the procedure to be followed in labor injunction cases." Id. at 4629. Representative LaGuardia echoed this approach, at 5479, noting that the bill bars injunctions without a hearing on testimony, and also bars injunctions against lawful acts. The Senate Committee report affords further confirmation of the distinction. It notes, and Senator Norris said substantially the same thing on the floor, 75 Cong.Rec. 4505–10, that injunctions depriving workers of the right to assemble, picket, strike, and the like were "indefensible" and de-

clares that "the bill, under section 4, takes away from all Federal courts the power to issue such injunctions." 72d Cong., 1st Sess., S.Rep. No. 163, p. 17. Section 7 was separately discussed as "procedure." Id., p. 21. Opponents, such as Representative Beck of Pennsylvania, were equally convinced that sections 4 and 5 were absolutes, forbidding any and all injunctions against strikes or other enumerated activities. 75 Cong. Rec. 5471–72, 5474, 5500.

2. "Minor" disputes, § 3, are those "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * *" "Major" disputes include those arising during bargaining for a new contract. Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. Co., 1957, 353 U.S. 30, 33, 77 S.Ct. 635, 1 L.Ed.2d 622.

festly imports a legal obligation," which, as insisted by counsel for the Brotherhood, who had represented principal railway labor organizations at the hearings on the Railway Labor Act, authorized "any court of competent jurisdiction to restrain either party to the controversy from changing the existing status" during the period, 281 U.S. at pages 565–566, 50 S.Ct. at page 434.

Virginian Ry. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 57 S.Ct. 592, 607, 81 L.Ed. 789, came after Norris-LaGuardia, and after the 1934 amendment of the Railway Labor Act as well. As in the Texas & New Orleans case, the injunction was against the carrier, its principal thrust being a direction to bargain with a union designated by the Mediation Board under § 2 Ninth. No contention was or could have been made that this portion of the injunction violated § 4 of Norris-LaGuardia; the only Norris-LaGuardia contention specifically mentioned in the Supreme Court's opinion was one under § 9, which limits an injunction to "a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint * * * and as shall be expressly included in * * * findings of fact made and filed by the court * * *" The Supreme Court deemed it "unnecessary to comment on other similar objections, except to say that they are based on strained and unnatural construction of the words of the Norris-LaGuardia Act. * * *" Examination of the briefs shows these objections included alleged violations of § 7(a) for lack of proof of "unlawful acts" and also of § 4(e), which prohibits injunctions against peaceful publicizing of a labor dispute, but the claim that the injunction had done the latter was scarcely made out. Mr. Justice Stone disposed of all Norris-LaGuardia objections by saying "It suffices to say that the Norris-LaGuardia Act can affect the present decree only so far as its provisions are found not to conflict with those of section 2, Ninth, of the Railway Labor Act (45 U.S.C.A. § 152, subd. 9), authorizing the relief which has been granted. Such pro-

visions cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act," 300 U.S. at pages 562–563, 57 S.Ct. at page 601. This language affords much opportunity for spinning gossamer. It could be read to mean that Norris-LaGuardia is wholly inapplicable to a controversy arising solely under a provision added to the Railway Labor Act in 1934; such a construction would raise the question whether, as to controversies under provisions of the 1926 Act that were reenacted in 1934, Norris-LaGuardia applied fully or not at all. A more reasonable interpretation, at least as regards the contention under § 7 of Norris-LaGuardia, is that the carrier's disobedience of § 2 Ninth constituted "unlawful acts" within § 7(a) and hence justified the injunction as the District Court had held, E.D.Va.1935, 11 F.Supp. 621, affirmed 4 Cir., 1936, 84 F.2d 641.

Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. Co., 1944, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, held that an injunction against violence during a strike, of the sort permitted by §§ 4 and 7 of Norris-LaGuardia, should have been denied, under § 8 of that Act, by reason of the plaintiff's failure to make reasonable efforts at settlement. Its chief significance for present purposes lies in its being the first case in which the Norris-LaGuardia Act was applied by the Court to support denial of an injunction in a railroad labor controversy, 321 U.S. at pages 57–60, 64 S.Ct. at pages 417–418.

There follow a group of cases dealing with racial discrimination by unions. Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, came before the Court on certiorari to the Supreme Court of Alabama; hence no Norris-LaGuardia problem could have been in the Court's mind when it used the broad language that it did, 323 U.S. at page 207, 65 S.Ct. at page 234, concerning the judicial enforcement of rights under the Railway Labor Act. Examination of the briefs in the companion case, Tunstall v. Brotherhood of Locomotive Firemen & Enginemen,

1944, 323 U.S. 210, 65 S.Ct. 235, 89 L. Ed. 187, which came from the Fourth Circuit, 140 F.2d 35, shows that defendant there made no Norris-LaGuardia contention and nothing specific was said on the subject in the Supreme Court's opinion. In Graham v. Brotherhood of Firemen, 1949, 338 U.S. 232, 238–239, 70 S.Ct. 14, 18, 94 L.Ed. 22, objection as to lack of the findings of unlawful action demanded by § 7 of Norris-LaGuardia was vigorously pressed. The Court disposed of this on the bases that the Steele and Tunstall cases had settled "that the Railway Labor Act imposes upon the Brotherhood the duty to represent all members of the craft without discrimination and invests a racial minority of the craft with the right to enforce that duty"; that Norris-LaGuardia does not "contain anything to suggest that it would deprive these Negro firemen of recourse to equitable relief from illegal discriminatory representation"; and "Conversely there is nothing to suggest that, in enacting the subsequent Railway Labor Act provisions insuring petitioners' rights to nondiscriminatory representation by their bargaining agent, Congress intended to hold out to them an illusory right for which it was denying them a remedy." 338 U.S. at pages 239–240, 70 S.Ct. at page 18. In Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283, the issue as to § 7 of Norris-LaGuardia was again raised; the Court said it "need add nothing to what was said about inapplicability of that Act in the Steele case and in Graham v. Brotherhood of Firemen * * *" If the Graham decision had been rested solely on the first ground mentioned, it would support the proposition that violation of the duties imposed by § 2 of the Railway Labor Act is unlawful action within § 7 (a) of Norris-LaGuardia; but, as in Virginian, the emphasis on the "subsequent"

Railway Labor Act[3] creates some doubt whether the holding must be limited to violations of provisions added in 1934. The one thing that is clear is that, as said in Order of R. R. Telegraphers v. Chicago & N. W. Ry. Co., 1960, 362 U.S. 330, 338, 80 S.Ct. 761, 766, 4 L.Ed.2d 774, "None of these cases * * * enjoined conduct which the Norris-LaGuardia Act withdrew from the injunctive power of the federal courts * * *," although the agreement enjoined in Brotherhood of Railroad Trainmen v. Howard had been coerced by threat of a strike.

We thus arrive at Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, where the Court sanctioned an anti-strike injunction in a case growing out of a "minor dispute." That case rested upon the view that the provisions of § 3 of the Railway Labor Act, as extensively amended in 1934, providing for what amounts to compulsory settlement of "minor" disputes, established an implied exception to § 4 of Norris-LaGuardia. Appellees place heavy reliance on the statements, 353 U.S. at page 40, 77 S.Ct. at page 640 that "the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes" and that "There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved." Appellants counter with footnote 24 on page 42 of 353 U.S., on page 641 of 77 S.Ct., which said:

> "The Norris-LaGuardia Act has been held to prevent the issuance of an injunction in a railway labor case involving a 'major dispute.' Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50 [64 S.Ct. 413, 88 L.Ed. 534]. In such a case, of course, the Railway Labor Act does not provide a process for final decision like that of the Adjust-

---

3. In fact the Steele opinion had relied in part on provisions, § 2 Second, Third and what had been Fourth (now with some minor changes Sixth) which had come from the 1926 Act and were reenacted in 1934, and in part on other provisions, § 2 Fourth, Seventh and Ninth, added in 1934, 323 U.S. at pages 199–200, 65 S.Ct. at pages 230–231.

ment Board in a 'minor dispute' case."

Since the injunction in the Toledo P. & W. case had been denied, not because the dispute was "major" but because § 8 of Norris-LaGuardia prevented issuance of an injunction not prohibited under § 4, we read this as saying, not that there can never be an anti-strike injunction in a major dispute, but that such an injunction can be issued only on a showing, which the Court held to have been made as to "minor" disputes in the Chicago River case, that "accommodation" of the two statutes so requires.

The final datum is Order of R. R. Telegraphers v. Chicago & N. W. Ry. Co., supra. This establishes that § 4 of Norris-LaGuardia is not inapplicable to major railway labor disputes simply because they are railway labor disputes. It is not dispositive here since, on the view of the majority in that case, the union had violated no provision of the Railway Labor Act or, indeed, of any other.

To us this analysis demonstrates that the question whether an anti-strike injunction of the sort banned by § 4 of Norris-LaGuardia may be issued in a "major" railway dispute when there has been a violation of the Railway Labor Act and, more particularly, of provisions antedating Norris-LaGuardia, has simply not been determined by the Supreme Court. The decisions furnish, not an answer, but data for making one. Considerations arguing for a negative answer are that the Chicago River case, the only decision approving an injunction of the sort banned by § 4, involved a "minor" dispute for which compulsory arbitration had been provided and applied a provision postdating Norris-LaGuardia, and that Order of R. R. Telegraphers, the only decision specifically disapproving an injunction of the sort banned by § 4, involved a "major" dispute. Against this is that in Chicago River the Court naturally dealt only with the case before it—to say that an anti-strike injunction can be issued in a "minor" dispute is not to say that such an injunction cannot be issued in a "major" one if the Railway Labor Act is being violated and an injunction against a strike is the only effective remedy; and in the Telegraphers case the majority found no Railway Labor Act violation.

A strong case for sustaining an anti-strike injunction under the Railway Labor Act would be that mentioned by Chief Justice Hughes in Texas & N. O. R. Co. v. Brotherhood of Railway Clerks, supra, 281 U.S. at pages 565–566, 50 S.Ct. at page 432 namely, a threatened strike during the period "After the creation of such [Emergency] board and for thirty days after such board has made its report to the President," in which § 10 provides that "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." To be sure, such a case would differ from Chicago River in being a "major" dispute and in concerning a pre-Norris-LaGuardia provision of the Railway Labor Act. However, we should have little doubt that the latter Act, especially in the light of Representative LaGuardia's own statements quoted above, does not withdraw a power to enjoin which the Supreme Court, acting in part on representations by the railway unions themselves, had held to be conferred by § 10; when Congress reenacted that section in 1934, it did so with the gloss the Supreme Court had put upon it. Analytically, perhaps an even stronger case would be one governed by the similar "freeze" provision for the thirty day period after the Mediation Board had notified the parties that its mediatory efforts have failed, § 5 First, since this was added in 1934; actually it is hard to suppose the two cases would be differently decided. Slightly further along in the spectrum would be a threatened strike at an earlier date and hence not within either specific prohibition but, at least arguably, impliedly prohibited by the general scheme of the Railway Labor Act and §§ 2 First and Second, 5, 6 and 10. See American Airlines, Inc. v. Air Line Pilots Ass'n, D.C.S.D.N.Y.1958, 169 F. Supp. 777, 784, 788–789.

Still further along is a case where, as here, the claim is that although the motions specified by the Railway Labor Act were performed, the required spirit was lacking. Appellees argue with force that it is as much a violation of the Railway Labor Act to make only a token effort to comply with its prescribed processes as to strike without even the pretense; the problem is that issuing an injunction on such a ground inevitably involves the court in some consideration of the labor dispute as bearing on the good faith of the employee representatives—and this without the advance administrative screening provided under the National Labor Relations Act in 29 U.S.C.A. § 160(a), (b), (h), (i), and (l) and §§ 176–180. We find it unnecessary here either to affirm or to deny that an injunction against a strike may be issued on such a claim, cf. A. H. Bull S. S. Co. v. Seafarers' International Union, 2 Cir., 1957, 250 F.2d 326. For, assuming in appellees' favor that jurisdiction to do this is not excluded, both § 4 and § 7 would confine it to a clear case of union failure to comply with obligations under the Railway Labor Act, and the record affords no warrant for finding that in the instant case.

Appellees' claim that it does rests on two grounds: (1) that a provision in the Switchmen's Constitution, adopted in 1955, that "No authority shall exist to settle a general wage and/or rules movement arising from direct negotiation with a carrier or from mediation excepting only after approval by a majority vote of the membership," and a similar provision as to agreements to arbitrate, constitute a *per se* violation of § 2 of the Railway Labor Act; and (2), alternatively, that the combination of these provisions with the evidence as to appellants' conduct shows a violation here.

(1) Appellants have cited a large number of union constitutions with membership ratification requirements, and also texts noting and, in some instances, approving the practice of a referendum. Appellees respond that most of the references are of recent date; that few of the

constitutions cited are of railroad unions; that the major railroad unions do not so condition the authority of their representatives; that the carriers' representatives have power to conclude; that the railroad industry differs from others both in the more critical effect of a strike on the public interest, as recognized in the Railway Labor Act, and in the large number of unions able to precipitate one; and, finally, that the National Mediation Board has gone on record, in a suggestion made below, that "The restrictions thus placed upon the representatives of employees for whom the Switchmen's Union has been certified as bargaining agent are inconsistent with the provisions of the Railway Labor Act, defeat the purpose of the Act, and make its administration cumbersome and ineffective."

Decisions under the National Labor Relations Act have established that neither the employer nor the employees regulated thereby are required "to be represented in the bargaining negotiations by a person or persons with competent authority to enter into a binding agreement," Great Southern Trucking Co. v. N. L. R. B., 4 Cir., 1942, 127 F.2d 180, 185, certiorari denied 1942, 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524; N. L. R. B. v. New Britain Machine Co., 2 Cir., 1954, 210 F.2d 61, 62; Lloyd A. Fry Roofing Co. v. N. L. R. B., 9 Cir., 1954, 216 F.2d 273, 275–276, although lack of such authority is "a factor which should be taken into consideration in order to decide whether the * * * effort to negotiate was really made in good faith," Great Southern Trucking Co. v. N. L. R. B., supra; N. L. R. B. v. A. E. Nettleton Co., 2 Cir., 1957, 241 F.2d 130, 133–34. Appellees say the statutory language here is different; to some extent it surely is. The original Labor Relations Act required an employer "to bargain collectively with the representatives of his employees," Act of July 5, 1935, c. 372, § 8(5), 49 Stat. 449, 453, and the Taft-Hartley Act of 1947 imposed a corresponding obligation on labor organizations, § 8(b) (3), and added the defini-

tion, in § 8(d), that the obligation is "to meet at reasonable times and confer in good faith * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession." In contrast, § 2 First of the Railway Labor Act requires the parties to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes * * * in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof"; § 2 Second prescribes that all disputes "shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer * * * "; and there are provisions for mediation, arbitration, and emergency boards which have no precise counterparts in the Labor Relations Act. Still we find nothing in all this that says the representatives must be authorized to conclude; indeed § 2 Second says, rather explicitly, that what they must be authorized to do is to confer. Appellees rely on certain language in Mr. Justice Rutledge's opinion for a majority in Elgin, Joliet & Eastern R. Co. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886, opinion adhered to on rehearing, 1946, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928, distinguishing the role of employees' representatives in major disputes from that in grievances, 325 U.S. at pages 728–729, 739–740, 65 S.Ct. at pages 1282, 1297; appellants rely on the decision there that the Railway Labor Act does not require the vesting of authority in the representatives in grievance cases and argue the same must be true for major disputes as well. We do not believe that either the majority or the minority opinion in Elgin dealt with the question here presented.

(2) Whether the entire course of appellants' conduct violated the requirements of the Railway Labor Act requires a fuller statement of the dispute than we have yet made. Much of that history is stated in the July 8, 1960 report of the Emergency Board, annexed to the complaint. The dispute began with notices served by the Union on February 21, 1959, and by the carriers on March 20, 1959, under § 6 of the Railway Labor Act; the former demanded a 12% increase and the latter a decrease in rates of pay. After initial conferences with individual carriers, it was agreed to refer the dispute to national handling. Conferences on that basis began September 17, 1959; after three fruitless bargaining sessions, the parties invoked the services of the National Mediation Board. The Mediation Board's efforts proved unsuccessful. After a strike vote and notice of intention to strike, the Board terminated its services and urged the parties to arbitrate under § 7; the carriers accepted the suggestion but the Union negotiators rejected it without submission to the members. On May 23, 1960, the President created Emergency Board 131 to report on the dispute.

Shortly thereafter a "pattern" of settlements in the industry began to emerge, as a result of an arbitration award in a proceeding between the carriers represented by the Eastern, Western and Southeastern Carriers' Conference Committee and the Brotherhood of Locomotive Engineers, a mediation agreement between the railroads and the Order of Railway Conductors and Brakemen, and the report of Emergency Board No. 130 with respect to Non-Operating Employees represented by eleven cooperating railway organizations. Broadly speaking, these provided for incorporating past cost-of-living adjustments into the basic wage and for stipulated wage increases (2% on July 1, 1960, and an additional 2% on March 1, 1961, for the engineers, conductors and brakemen; 5¢ per hour July 1, 1960, and an improved health and welfare program in early 1961 for the non-operating employees). It was then agreed to narrow the issue before Emergency Board 131 to whether "the yard ground service employees * * * should be granted an increase beyond the 'pattern' because of an alleged intra-industry inequity."

The alleged inequity was this: The Switchmen claimed that historically their pay had approximated that of yard and road service operating employees and had considerably exceeded that of other non-operating employees. This situation, they claimed, had been altered, to their detriment, by two factors. Although the basic day rates of the yard service employees had been raised along with those of the road service employees, the latter enjoy a "dual basis" for pay in terms of hours or miles, whichever produces the greater compensation; as a result of the artificially low mileage equated to a day's work, the road service employees can earn a day's pay for much less than a day's work or receive more than a day's pay for only a day's work. On the other side, the preponderance of uniform cents per hour increases had diminished the differential between the non-operating employees and the allegedly more skilled switchmen.

The Emergency Board expressed itself as "convinced of the good faith of the Organization in pressing its 'inequity' case * * * " It thought, however, that the absence of evidence whether the various differentials, or lack of them, were or were not justified, the acceptance of the pattern by organizations representing other employees in yard and local freight service, and the impracticability of correcting in any one year alleged inequities that had grown up over many, combined to require a resolution of the current wage dispute on the same basis as adopted for the Engineers and Conductors, which had later been accepted by the Firemen and the Trainmen.

On July 20, 1960, a fortnight after the Board's report, the Carriers' Conference Committee and the Union formulated an agreement substantially embodying the recommendations of the Emergency Board. Along with this was a letter providing that if the Union wished "further handling" of "the wage inequity issue," it should give written notice to the carriers; if the parties were then unable to dispose of the issue and "further handling" was desired, the issue was to be submitted to arbitration under the Railway Labor Act. Neither the agreement nor the letter was signed, but the committees representing the Union and the carriers issued a joint statement that they had "reached an agreement on a proposal to be submitted to the membership of the Switchmen's Union of North America for approval, in accordance with the laws of that organization."

A week later, the International President of the Union wrote its Presidents, Secretaries and Local Chairmen. He reviewed the history of the dispute, the position taken by the Union negotiators, the report of the Emergency Board, and the subsequent negotiations; summarized the agreement; called attention to the provisions of the Union Constitution with respect to approval; and requested that balloting be conducted. On August 18, he notified the carriers that the settlement had been rejected, and proposed August 30 for a further conference. The conference achieved nothing, and on September 1 the Union notified the Mediation Board it had set a strike for September 8, later postponed at the Board's request to September 19; further conferences were held. The Union negotiators advanced various suggestions for modifying the agreement in a manner which they thought might make it acceptable to the switchmen. One was for an additional 2.73¢ per hour, approximately a 3% rather than a 2% increase, an amount calculated to produce the same annual increase for the switchmen as had been granted the engineers. When the carriers rejected this offer,[4] the Union proposed equivalent additions in the form of fringe benefits, evidently in the hope that this might ease the carriers' "pattern" problem. The carriers stood on the July 20 agreement. On September 16 they filed this action and obtained a temporary restraining order, followed by the temporary injunction here under appeal.

---

4. A witness for the carriers testified that if the "three and three per cent" proposal "were applied across the section," it would cost the railroad approximately $100,000,000 "more than the pattern."

We find nothing in this history to show the Union simply went through the motions of bargaining. The controversy was that most intractable of all types of labor disputes—a question of principle. From the carriers' standpoint the Union's refusal to accept the "pattern" was indeed arbitrary, involving not only larger increases to the switchmen than to other crafts but the possibility of a chain reaction. Yet, from the Union's standpoint, acceptance of the "pattern" would continue the very "inequity" of which they were complaining, sincerely so far as the record shows, whether justifiably or not. The carriers say the Union negotiators should at least have recommended the settlement; appellants respond there was nothing wrong in the negotiators' simply putting up to the men whether to take the benefits they had obtained and shelve the inequity issue, or to press the latter even if this meant invoking the ultimate weapon. We should not suppose it to be bad faith for an employer's representatives to report a proposal as the best obtainable without taking a strike but still as something they did not recommend; we see no reason for a different rule as to a union's. The evidence is convincing that after the vote the Union negotiators did not stand on the original demand for a 12% increase; they made suggestions whereby the increases would conform to the Union's ideas of equity even though the total resulting wages still would not.[5] The reasons for the carriers' rejection of these suggestions are understandable, but that does not make the Union's conduct so wholly arbitrary as to pass beyond the bounds of good faith endeavor to reach agreement. Certainly the parties had reached the end of the bargaining road if their conduct were being tested under § 8(d) of the Labor Relations Act—neither would have been compelled "to agree to a proposal" or to make "a concession."

See N. L. R. B. v. United Clay Mines Corp., 6 Cir., 1955, 219 F.2d 120, 125–126; Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1412–1422 (1958). Assuming, as we do, that the Railway Labor Act imposes a somewhat greater duty to endeavor to reach agreement, it no more required the switchmen to abandon all efforts to correct what they deemed an inequity than it compelled the carriers to depart from the "pattern" of settlements with other crafts.

Appellees say this does not matter in view of the judge's alternative finding that "There are serious, substantial, difficult, and doubtful questions" on the issue of good faith. They urge that since it is only a temporary injunction we are reviewing, and no one has contested the finding that irreparable damage would flow from its denial, the only point open to review is whether even this alternative finding was clearly erroneous, citing particularly our decision in Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, 740, from which the quoted language was evidently taken.

We think this an overly literal reading of Hamilton Watch Co. v. Benrus; the language quoted from Judge Frank's opinion must be taken along with the beginning of the sentence, "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt," and the statement that the Court could not "possibly" declare the District Court's substantive findings of probable Clayton Act violation to have been clearly erroneous. Here we regard the finding of breach of the Railway Labor Act by the Union as being so on the evidence the judge had before him; Hamilton v. Benrus does not say it is enough that further evidence might demonstrate it was not. Furthermore, even if the rule of review were as

5. We have not overlooked the carriers' testimony that the Union representatives said on August 30 they had no authority to settle on anything other than their original proposal. The evidence makes it clear that the Union negotiators said only they could settle on no other proposal without going back to the men, and that, in fact, they did make other proposals subject to such ratification.

plaintiffs allege, we doubt it would sustain continued enforcement of the temporary injunction when more than seven months have passed since it was issued and plaintiffs have done nothing to bring about a resolution of the questions by the District Judge although, so far as appears, the court has been open for that purpose.[6]

██ Beyond this, whatever the general rule as to the scope of review of temporary injunctions may be, no such principle as plaintiffs advocate can be applicable to a claim that such an injunction transgresses the command of § 4 of the Norris-LaGuardia Act. That section uses the most emphatic words possible —"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction" against a peaceful strike. To overcome that bar plaintiffs had the burden of showing, as a matter of law, that the broad command of § 4 is subject to an exception when a union has violated its duties under the Railway Labor Act and, as a matter of fact, that the defendant here had done that. They were obliged to meet that burden, not simply to show they might be able to meet it;[7] until they met it, the court was without power to issue an injunction whether temporary or permanent.[8]

Order reversed.

6. In Hamilton Watch Co. v. Benrus, the temporary injunction was issued April 27, 1953, D.C.Conn.1953, 114 F.Supp. 307; the appeal was argued June 2 and decided June 30.

7. We recognize that in Railroad Yardmasters v. Pennsylvania R. Co., 3 Cir., 1955, 224 F.2d 226, the Court used the Hamilton Watch Co. v. Benrus language in affirming an injunction claimed to violate § 7 of Norris-LaGuardia because the evidence did not support the finding required by § 7(a) "That unlawful acts have been threatened and will be committed" etc., which the statute also makes jurisdictional. However, as in Hamilton Watch Co. v. Benrus, there was no determination by the Court of Appeals that the substantive finding which the District Court had made on the evidence

presented, in that case of threatened unlawful action by the railroad, was clearly erroneous. In Missouri-Kansas-Texas R. Co. v. Brotherhood of Railway & Steamship Clerks, 7 Cir., 1951, 188 F.2d 302, 306, cited by appellees as being "to the same effect," there was held to be no "labor dispute" and hence no Norris-LaGuardia problem.

8. The Switchmen here urge that the injunction was also unlawful under § 7, both because violations of the Railway Labor Act are not "unlawful acts" within § 7(a) and because there is no proof of such violations in this case. For reasons pointed out in the text, we think the first proposition scarcely reconcilable with the Virginian, Graham and Howard cases. The second is very likely so, but our holding as to § 4 is dispositive.