J. W. EDWARDS, Plaintiff-Appellant,

v.

ST. LOUIS–SAN FRANCISCO RAIL-ROAD COMPANY, a Corporation, National Railroad Adjustment Board, First Division, Eugene A. Killeen, Executive Secretary, H. W. Burtness, G. L. Buuck, Don Miller, B. W. Fern, K. Levin, W. R. Meyers, H. V. Bordwell, J. E. Carlisle, E. T. Horsley, and A. E. Myles, Defendants-Appellees.

No. 15400.

United States Court of Appeals
Seventh Circuit.

May 13, 1966.

Swygert, Circuit Judge, dissented in part.

948

Joseph P. Jenkins, Kansas City, Kan., Louis F. Cainkar, Chicago, Ill., Joseph Cohen, Charles S. Schnider, Edward G. Collister, Jr., Gerald T. Elliott, Kansas City, Kan., for plaintiff-appellant.

Burke Williamson, Martin M. Lucente, Chicago, Ill., Thomas E. Deacy, Jr., Kansas City, Mo., John A. Hutchings, William P. Richmond, Chicago, Ill., for de-fendants-appellees; Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel.

Before CASTLE and SWYGERT, Circuit Judges, and GRANT, District Judge.

GRANT, District Judge.

Appellant brought this action in the district court against his former employer, the St. Louis-San Francisco Railroad Company, and the National Railroad Adjustment Board, First Division, and certain named individuals, members of the First Division of the National Railroad Adjustment Board. By his complaint, appellant sought to set aside a previously entered order of the Adjustment Board and to obtain judgment against the railroad in the sum of $50,-000 for wrongful discharge and breach of employment contract, plus $100,000 in punitive damages for "willful and wanton disregard of [appellant's] rights".

Motions to dismiss were filed in the proceeding below by (a) H. W. Burtness, H. V. Bordwell, J. E. Carlisle, E. T. Horsley and A. E. Myles, Carrier Members of the National Railroad Adjustment Board, First Division, and (b) K. Levin and Don Miller, Labor Members. The lower court treated these motions as motions for summary judgment, and granted them. A motion to dismiss for lack of jurisdiction and lack of service of process filed by the railroad was also granted. The district court on its own motion then dismissed the complaint as to the remaining defendants. The alleged errors relied upon in this appeal were to have arisen out of the granting of these motions. This Court, however, finds the memorandum order of the district court effecting the disposition of these motions to be eminently correct in all particulars, and therefore affirms its judgment.

The facts of this case are as follows: On September 25, 1960, the appellant, who was then—as he had been for some forty years—employed by the St. Louis-San Francisco Railway Company as a conductor in passenger service, was taken off his run and charged with failure

to remit a five dollar cash fare which appellant allegedly had collected from a passenger on or about August 28, 1960. The railroad was informed of the alleged incident in the morning of August 28, 1960, when the train's porter, J. D. McPherson, called V. J. Deckard, the railroad's Superintendent of Terminals in Kansas City. McPherson informed Deckard that with him was a woman who wanted to make a report. The woman then told Deckard that, while a passenger, she had given the conductor five dollars for a cash fare, but that she had been given no receipt for it. Deckard reported this to Special Agent Adams and asked him to investigate. Adams then prepared a statement from notes which he took at a conference with the woman, and the statement was signed by her. None of the three agents of the railroad actually saw the alleged incident take place.

Under the terms of the collective bargaining agreement in effect at that time between the Order of Railway Conductors and Brakemen and the railroad, a hearing must be held within five days for the individual so charged and taken off his run.[1] Accordingly, a hearing was held on railroad company property on September 27, 1960, at which appellant appeared and was represented by the General Chairman of the Order of Railway Conductors and Brakemen. The railroad, during the course of the hearing, called four witnesses: an officer of the railroad's accounting department, who testified that appellant had not remitted any cash fares which would have been collected on August 28, 1960, and the aforementioned train porter, terminal superintendent, and special agent, each of whom testified only as to the version of the incident that had been related to them by the complaining passenger. The testimony of the latter three witnesses was, of course, hearsay; and the railroad did not produce the passenger, appellant's accuser.

Once at the beginning and again at the end of the hearing, appellant protested the failure of the railroad to produce the complaining witness and his resultant inability to face and cross-examine his accuser.[2] Appellant did, however, testify

1. Article 40 of this agreement, which governs such matters as these insofar as conductors are concerned, provided as follows:

"Conductors shall not be suspended, discharged, or unfavorable entries made against their records, without just and sufficient cause. In case a conductor is taken off of his run he shall be given a hearing within five days from the time he is taken off, and shall be given sufficient notice in person or in writing, in advance, to have a conductor of his own choice present, who shall be permitted to examine all witnesses and papers pertaining to the case. Charges shall be specific, and he shall have the right to produce witnesses to testify in his behalf. If a conductor is found guilty he will be notified in writing within five days, discipline assessed and cause. If held out of or removed from service unjustly, he will be reinstated, and paid for all time lost. If a conductor feels that he has been unjustly dealt with he shall have the right to appeal within thirty days to his superior officer through his Local and General Chairman. When stenographic notes are taken the Local Chairman shall have a copy

of same to be returned when same has served his purpose."

2. At the opening of the hearing, the following colloquy took place between Mr. Dodd, representing appellant, and Mr. Gastler, representing the railroad:

"Mr. Dodd: I would like to ask, where is the complaining witness?

"Mr. Gastler: The complaining witness is not here. We do not have the power of subpoena to get her. If you desire to talk to her, we can attempt to get her if you desire the witness.

"Mr. Dodd: It is not my witness. It is the carrier's witness and responsibility of the carrier to have the complaining witness present, and if the complaining witness is not present we protest holding the investigation on the grounds that we are being denied the right to face our accuser.

"Mr. Gastler: Your protest is recorded, and again we do not have the power of subpoena in these investigations."
And, at the hearing's conclusion, the following exchange took place between the same representatives:

"Mr. Gastler: Mr. Dodd, are you satisfied with the manner in which the

in his own defense, categorically denying the charges against him and that he ever received a cash fare on the day in question. When asked how he accounted for the fact that the complaining passenger had not "materially changed her story" when relating it to three different agents of the railroad, appellant replied, "I don't account for it, sir, unless she misrepresented the facts and stuck to it."

With regard to appellant's due process protest, the hearing examiner apparently was convinced by the railroad that the latter was not contractually or otherwise bound to produce any witness—even a complaining witness—over whom the railroad did not have the power of subpoena. For, on September 30, 1960, the hearing examiner concluded that the charges against appellant had been sustained and accordingly appellant was dismissed from the service of the railroad.

Appellant, through his duly authorized representative, then proceeded to pro-gress the matter in accordance with the related grievance procedures of the collective bargaining agreement. The appeal procedures which the appellant pursued did not, however, result in any change in the dismissal which had been ordered as a result of the investigation heretofore described. Having thus handled his grievance up to and including the chief operating officer of the carrier designated to handle such disputes, appellant then elected to submit the dispute to the First Division of the National Railroad Adjustment Board pursuant to the appropriate provision of the Railway Labor Act.[3]

Having waived the oral hearing available at his request,[4] appellant chose to go to the Adjustment Board on the basis of the record as it then existed. This record consisted solely of a written submission in the nature of a complaint, to which was attached correspondence and other documents relating to the handling

investigation has been conducted and questions asked?

"Mr. Dodd: Due to the fact that upon our request that we have the right to face our accuser and that we were denied that right, I protest the investigation in its entirety and the message of September 25, 1960, holding Conductor Edwards out of service pending investigation, which in my opinion prejudged the guilt before evidence had been submitted in the investigation, therefore I object to the investigation as not being a fair and impartial investigation.

"Mr. Gastler: The statement was taken from Georgia Adams. She is in Turrell, Arkansas. I do not have the power of subpoena to get her as a witness. If you would like me to postpone the investigation while you get her, I will do that.

"Mr. Dodd: It is not our concern or obligation to have Mrs. Georgia Adams here because she was supposed to be a witness for the carrier and it was the carrier's responsibility and obligation to have Mrs. Adams here where she could be cross-examined, and this was not done."

3. The relevant statutory provision, 45 U.S.C. § 153 First (i), provides:

"The disputes between an employee or group of employees and a carrier or car-riers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

4. The relevant provision of the rules of the National Railroad Adjustment Board with respect to oral hearings is as follows:

"(a) Oral hearings will be granted if requested by the parties or either of them and due notice will be given the parties of the time and date of the hearing." 29 CFR 301.7(a).

The rules also specify the manner in which such a request shall be made:

"(c) Parties to a dispute are required to state in all submissions whether or not an oral hearing is desired." 29 CFR 301.6(c).

of the dispute by the railroad, including a transcript of the hearing held on September 27, 1960. The issues raised by appellant before the Board were: (1) whether the evidence adduced at the hearing held by the carrier supported the charge leading to his dismissal, and (2) whether the absence of the complaining passenger at the hearing violated the provision of Article 40 of the bargaining agreement which accords the accused or his representative the right to "examine all witnesses and papers pertaining to the case."[5] After deliberation over the case, the carrier and labor members of the Adjustment Board, being equally divided, failed to agree on a disposition of the dispute. In accordance with the provisions of the Railway Labor Act,[6] a referee was appointed to resolve the deadlock. The matter was presented to the referee on behalf of the appellant by a labor member of the Board's First Division, and the railroad's position was argued by a carrier member. The labor members and the carrier members took advantage of every opportunity to express their views in the proceedings before the referee.[7] Appropriate notice was given to all parties and all the customary and usual procedures of the Board were followed.[8]

On December 14, 1961, the National Railroad Adjustment Board handed down its award, denying appellant's claim for reinstatement with full rights and privileges and back pay for all time lost. Finding that there was "sufficient information" to support the carrier's decision to invoke sanctions against appellant, the award turned to the "more perplexing question [of] whether procedural due process was complied with. * * *" Basing its decision on this issue on interpretation of Article 40 of the collective bargaining contract,[9] which provision governs the resolution of such disputes between the railroad and its conductors, the referee found that there was no contractual right to demand that the complaining witness be produced for the purposes of confronting the accused.[10] To these findings, the labor members of the Board registered a vigorous and bitter dissent.[11]

5. The Adjustment Board's opinion and award, rendered on December 14, 1961, framed these issues as follows:
"In order to sustain the claim we must find that the carrier acted arbitrarily and without sufficient evidence to sustain its decision, and furthermore, in the course of the investigation acted unfairly and partially to the prejudice of the claimant, without regard to the contractual discipline procedures agreed upon by the parties."

6. 45 U.S.C. § 153 First (l).

7. The affidavit attached to the motion to dismiss filed in the district court by labor members Levin and Miller stated, in part:
"The five labor members of the First Division of the National Railroad Adjustment Board made every effort to obtain an award reinstating the plaintiff to the employ of the carrier, but they were not able to do so."

8. The affidavit of defendant Horsley attached to the motion to dismiss filed in the district court by the carrier members of the Board, stated, in part:
"Before the Board, all customary and usual procedures were followed. The labor members and the carrier members took advantage of every opportunity to fully express their view of the dispute."

9. Article 40 is set forth in its entirety at Note 1, supra.

10. On this issue, the referee in the award said:
"* * * The complainant was denied the fundamental right of confrontation. While one's sense of fair play is, and should be severely troubled by the absence or nonpresence of what admittedly is the most important witness in the proceedings, nevertheless, under the terms of Article 40, 'all witnesses' must be construed to mean only those witnesses under the control and direction of the carrier. Lacking the power of subpoena, there is no contractual right, even if a reasonable person might feel there was a moral and ethical right, to demand that the complaining witness be produced for the purposes of confronting the accused."

11. The concluding paragraph of the labor members' dissent is as follows:
"Considering the entire record evidencing prejudgment, conclusions and lack of conclusive and substantive proof,

Following the denial of his claim by the National Railroad Adjustment Board, appellant filed the complaint involved in this appeal. In order to better set forth our views on the issues of law presented herein, we deem it appropriate to discuss such matters in terms of what actually are two lawsuits filed by appellant: first, the action against the National Railroad Adjustment Board, First Division, and the Board members; and, secondly, the action against the St. Louis-San Francisco Railroad Company.

I. The Action Against the National Railroad Adjustment Board, First Division, and the Individual Members of the Board.

That we have seen fit to present the facts of this case in some detail is not without purpose. This appellant was dismissed from his employment and deprived of his livelihood after forty years on the job on the sole basis of hearsay evidence. Moreover, when considered as a whole, the evidence adduced at the company hearing really indicated nothing more than the fact that a passenger charged a conductor with an act which the latter denied. What is particularly offensive is that the carrier not only elected to accept the charge of its hitherto unknown customer and reject the denial of its long-standing employee, but that it imposed the harshest of all available sanctions under circumstances which made it extremely difficult, if not impossible, for the accused to test the credibility of his accuser. Indeed, it is hard to imagine a situation in which a carrier could act with greater distrust of a veteran employee or greater disdain for the conventional notions of fair play and still meet its obligations under grievance procedures prescribed by a collective bargaining agreement.

Thus, on its facts, this is a hard case; and, appropriately enough, this Court has been asked to make what it considers to be bad law. This we must decline to do.

 As has been pointed out, this matter was submitted to the National Railroad Adjustment Board pursuant to Section 3, First, of the Railway Labor Act, which provision confers upon the Board jurisdiction over all disputes between carriers and their employees "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * *." [12] Determinations made by the Adjustment Board of such disputes are to be "final and binding upon both parties to the dispute, except insofar as they shall contain a money award." [13] This latter provision has been interpreted literally by the Supreme Court, and that Court "time and again has emphasized and re-emphasized that Congress intended minor grievances of railroad workers to be decided finally by the Railway Adjustment Board." Gunther v. San Diego & A. E. R. Co., 382 U.S. 257, 263, 86 S.Ct. 368, 372, 15 L.Ed.2d 308 (1965); see also, Brotherhood of Locomotive Engineers v. Louisville & Nashville R. Co., 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963); Union Pacific R. Co. v. Price, 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). Appellant, therefore, cannot come before this or the district court complaining that the award of the Railroad Adjustment Board was based on insufficient evidence or that the Board incorrectly interpreted or wrongfully applied a provision of a collective bargaining agreement.

---

we are unable to determine how this Referee, in view of his own admissions, and his conscience, could deprive the claimant with 40 years service of his livelihood."

12. 45 U.S.C. § 153 First (i). See text at Note 3, supra.

13. 45 U.S.C. § 153 First (m). There was of course, no money award in the Board's order denying appellant's claim in this case.

Virtually acknowledging this general principle of law, appellant has sought refuge in an apparent exception thereto, contending that when the National Railroad Adjustment Board violates an employee's constitutional rights by affording him less than due process, the employee may collaterally attack the award of the Board in an appropriate federal district court. The cases to this end, however, uniformly state that denial of due process *by some conduct of the National Railroad Adjustment Board* in making the award invests the district court with jurisdiction under the Railway Labor Act to review the award when it would not otherwise have the power to do so. D'Elia v. New York, New Haven & Hartford R. Co., 230 F.Supp. 912 (D. Conn.1964), aff'd 338 F.2d 701 (2d Cir. 1964); Hornsby v. Dobard, 291 F.2d 483 (5th Cir. 1961); Ellerd v. Southern Pacific Railroad Co., 241 F.2d 541 (7th Cir. 1957); Barnett v. Pennsylvania-Reading Seashore Lines, 245 F.2d 579. (3d Cir. 1957); Brotherhood of Railroad Trainmen v. Templeton, 181 F.2d 527 (8th Cir. 1950); Edwards v. Capital Airlines, Inc., 84 U.S.App.D.C. 346, 176 F.2d 755 (1949). As the Second Circuit said in the appeal of D'Elia case, supra, 338 F.2d at 702:

> "The initial hearing in D'Elia's case was held by a representative of the employer railroad. This is the procedure provided in the collective agreement between the railroad and D'Elia's union and it is the procedure contemplated by the Railway Labor Act. See Subsection First (i) of Section 3, 45 U.S.C. § 153. Under the Act, D'Elia was entitled to a completely impartial hearing only when the case reached the referee designated to sit with the Board. As long as the final hearing officer was impartial the

requirements of due process were satisfied."

This line of cases, therefore, is inapposite to the instant case wherein the only instance of failure to afford the employee due process occurred during the initial hearing on railroad property rather than during any proceeding before the Adjustment Board.[14]

The provisions of the Railway Labor Act govern neither the procedure by which a carrier may discharge its employees nor the conduct of an investigation hearing on railroad property. It is true, of course, that the Act contemplates that disputes "growing out of grievances or out of the interpretation or application of agreements" shall, prior to referal to the Adjustment Board, "be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes * * *."[15] In fact, Subsection First and Second of Section 2 of the Act[16] prescribe it to be the duty of both carriers and employees "to exert every reasonable effort to * * * settle all disputes, whether arising out of the application of such agreements or otherwise * * *," and to make this effort "in conference between representatives designated and authorized so to confer, respectively, by the carrier * * * and by the employees thereof interested in the dispute." However, Subsection Sixth of Section 2,[17] which sets forth the time and place of the conferences of representatives, concludes with the proviso that "nothing in this chapter shall be construed to supersede the provisions of any agreement (as to conferences) then in effect between the parties." This latter prescription of the statute makes it quite evident that "[t]he Railway Labor Act does not empower the courts to enforce against rail-

14. Even defendants Miller and Levin (successor to labor member McGill), who along with the other labor members of the Board "made every effort to obtain an award reinstating the plaintiff to the employ of the carrier", admitted in their appeal brief and in oral argument that

appellant was not deprived of due process at the hearing before the National Railroad Adjustment Board.

15. 45 U.S.C. § 153 First (i).

16. 45 U.S.C. § 152 First and Second.

17. 45 U.S.C. § 152 Sixth.

roads any prescribed procedure for investigating and discharging its employees * * *." Brooks v. Chicago R. I. & P. R. Co., 177 F.2d 385, 391 (8th Cir. 1949). Therefore, when a railroad employee questions the propriety of the initial hearing held on carrier property, his claim must be based on the provisions of the collective bargaining agreement relating to that subject. In this case, appellant's due process claim put in issue Article 40 of the bargaining agreement and, more precisely, the words "all witnesses" contained therein. The award of the Adjustment Board holding that Article 40 referred only to those witnesses under the control and direction of the carrier, as we have said, is not subject to review in federal court nor may this Court substitute its views as to the proper interpretation thereof.

 In support of his claim for lack of due process against the National Railroad Adjustment Board, appellant makes the further, and more novel, contention that, assuming the railroad and the union could contract privately for hearing procedures which do not include all safeguards provided by the federal constitution, the Adjustment Board—"an administrative arm of the federal government"—cannot enforce a decision or action taken prior to its own finding where that decision or action would itself be unconstitutional in the first instance, citing Shelley v. Kraemer, 334 U.S. 1, 18–23, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). This contention, however, in light of the legislative history of the Railway Labor Act [18] and the applicable case law, entirely mistakes the nature of the Adjustment Board itself and the intention of Congress in prescribing preliminary "conferences" and "negotiations" at the company level as a prerequisite to submitting a dispute to the Board. Basically, all that is required of the initial conference on company property is that "men of good faith must in good faith get together in a sincere effort to resolve their differences." Rutland Railway Corporation v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 41 (2d Cir. 1962). The federal courts are not the guarantors of any rights of either labor or management at the initial hearing, either by force of the Constitution [19] or the Railway Labor Act,[20] for, as we have said, at that stage the dispute is between private parties and the applicable procedure for settling the dispute is governed by the contract between them.

Furthermore, appellant's characterization of the Adjustment Board as an "arm of the federal government" is an imprecise over-simplification of the issue as he presents it. While there is no doubt that the National Railroad Adjustment Board has responsibilities which

---

18. For the legislative history of the Railway Labor Act, see, e. g., Union Pacific R. Co. v. Price, 360 U.S. 601, 608–614, 79 S.Ct. 1351 (1959); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 35–39, 77 S.Ct. 635 (1957); Hearings before House Committee on Interstate and Foreign Commerce on H.R. 7650, 73d Cong., 2d Sess. (1934); Hearings before Senate Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess. (1934); Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L.J. 567 (1937).

19. The only fully litigated constitutional issue appears to be the right to counsel, the courts repeatedly having held that an employee is not constitutionally so protected at the initial hearing on company property. D'Elia v. New York, New Haven & Hartford R. Co., 230 F.Supp. 912 (D. Conn.1964); D'Amico v. Pennsylvania Railroad Co., 191 F.Supp. 160 (S.D.N.Y. 1961); Butler v. Thompson, 192 F.2d 831 (8th Cir. 1951); Broady v. Illinois Cent. R. Co., 191 F.2d 73 (7th Cir. 1951), cert. den. 342 U.S. 897, 72 S.Ct. 231, 96 L.Ed. 672 (1951); Brooks v. Chicago, R. I. & P. R. Co., 177 F.2d 385 (8th Cir. 1949).

20. "The provisions of the Railway Labor Act * * * neither compel the employer to enter into any agreement, nor preclude it from entering into any contract with individual employees. They do not 'interfere with the normal exercise of the right of the carrier to select its employees or to discharge them.'" Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 559, 57 S.Ct. 592, 605, 81 L.Ed. 789 (1937).

ultimately flow to the public, it is equally evident that the Board is not of the conventional species of governmental agency as they are generally envisaged.[21] Rather, this Board is part of "a framework for peaceful settlement of labor disputes between carriers and their employees." Union Pacific R. Co. v. Price, supra, 360 U.S. at 609, 79 S.Ct. at 1356, consisting of bipartisan representatives selected[22] and paid[23] by the respective parties, the purpose of which is to provide "a mandatory, exclusive, and comprehensive system for resolving grievance disputes," Brotherhood of Locomotive Engineers v. Louisville & Nashville R. Co., supra, 373 U.S. at 38, 83 S.Ct. at 1062, in the nature of "compulsory arbitration in this limited field." Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., supra, 353 U.S. at 40, 77 S.Ct. at 640. Looking to the nature of the Board itself, therefore, it is clear that the action it took in this case, the procedural aspects of which were those contemplated by the statute, cannot be said to be of that category of "governmental action" prohibited by the constitutional demands of Shelley v. Kraemer.

Moreover, appellant's attempt to equate the review functions of the Adjustment Board with prohibited governmental action ultimately resolves itself into a direct attack upon the constitutionality of those provisions of the Railway Labor Act creating the Adjustment Board with authority to finally settle disputes which evolve otherwise unadjusted out of the grievance procedure agreed upon between the parties. If appellant were to prevail on this contention, the Adjustment Board, at best, would have limited jurisdiction to settle only those disputes which had come up through constitutionally acceptable procedures below, and, therefore, the Railway Labor Act would do indirectly what it does not pretend to do directly, that is, regulate the grievance procedures at the company level, procedures heretofore left to the carrier and the employees to devise for themselves. However, considering the over-riding responsibility and right of Congress to regulate commerce, we do not feel that the defects in the Act here alleged can be said to be so arbitrary or unreasonable as to infringe due process. As the Supreme Court said when approving the constitutional validity of Section 2 of the Act in Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 558, 57 S.Ct. 592, 604 (1937): "Even though Congress, in the choice of means to effect a permissible regulation of commerce, must conform to due process, * * * it is evident that where, as here, the means chosen are appropriate to the permissible end, there is little scope for the operation of the due process clause." (Citations omitted.)

Therefore, for the reasons hereinabove set forth, we are of the considered opinion that the district court was correct in holding that, under the circumstances of this case, it had no right to review the order of the National Railroad Adjustment Board.

II. The Action Against the St. Louis-San Francisco Railroad Company.

Appellant's action against his former employer, the St. Louis-San Francisco Railroad Company, for money damages based on a claim of wrongful discharge

21. Thus, the Administrative Procedure Act, 5 U.S.C. § 1001 et seq., has been held not applicable to the National Railroad Adjustment Board, Brotherhood of Loc. Fire & Eng. v. Chicago, B. & Q. R. Co., 225 F.Supp. 11 (D.D.C.1964), aff'd 118 U.S.App.D.C. 100, 331 F.2d 1020 (1964), cert. den. 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964); Barnett v. Pennsylvania-Reading Seashore Lines, 245 F.2d 579 (3d Cir. 1957); Kirkland v. Atlantic Coast Line R. Co., 83 U.S.App.D.C.

205, 167 F.2d 529 (1948), and at least one court has even gone so far as to say that the Adjustment Board "is not a governmental agency." Dahlberg v. Pittsburgh & L. E. R. Co., 138 F.2d 121, 123 (3d Cir. 1943), quoting the dissenting opinion in Washington Terminal Co. v. Boswell, 75 U.S.App.D.C. 1, 124 F.2d 235, 276 (1941).

22. 45 U.S.C. § 153 First (a), (b), and (c).

23. 45 U.S.C. § 153 First (g).

and breach of contract was dismissed by the district court for lack of jurisdiction and lack of service of process. As has been indicated, we approve and affirm this ruling of the lower court.

The contract sued upon in this action is the collective bargaining agreement between the railroad and the Order of Railway Conductors and Brakemen, appellant's union, for the benefit of appellant. There being no allegation of federal law affecting the rights of the respective parties, the only ground for jurisdiction of the district court is diversity of citizenship, and it is alleged in the complaint that appellant is a citizen and resident of Kansas and that the railroad is a corporation organized under the laws of the State of Missouri.

The basic requisites of diversity jurisdiction having been met,[24] we now turn to the question of whether the railroad, a foreign corporation, is amenable to suit in a federal district court sitting in the State of Illinois. This Circuit has consistently held that whether a foreign corporation is present or doing business in a state so as to be subject to process and jurisdiction of a federal court therein is a matter of substantive law and hence, subject to federal constitutional limitations, is gov-

erned by the law and court decisions of that state. Canvas Fabricators, Inc. v. William E. Hooper & Sons Co., 199 F.2d 485 (7th Cir. 1952); Schmidt v. Esquire, Inc., 210 F.2d 908 (7th Cir. 1954), cert. den. sub nom. Schmidt v. Crowell-Collier Publishing Co., 348 U.S. 819, 75 S.Ct. 31, 99 L.Ed. 646 (1954); Roberts v. Evans Case Co., 218 F.2d 893 (7th Cir. 1955); Riverbank Laboratories v. Hardwood Products Corporation, 220 F.2d 465 (7th Cir. 1955), reversed 350 U.S. 1003, 76 S.Ct. 648, 100 L.Ed. 866 (1956);[25] National Gas Appliance Corporation v. AB Electrolux, 270 F.2d 472, 473 (7th Cir. 1959), cert. den. 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.2d 542 (1960); Haas v. Fancher Furniture Company, 156 F.Supp. 564 (E.D.Ill.1957); Rensing v. Turner Aviation Corporation, 166 F.Supp. 790 (E.D.Ill.1958); Green v. Robertshaw-Fulton Controls Company, 204 F.Supp. 117 (S.D.Ind.1962). While this issue has presented some difficulty to the courts that have considered it and there is authority to the contrary,[26] it has lately been said in a scholarly opinion by Judge Friendly of the Second Circuit that the position we take here is that of the "overwhelming consensus." Arrowsmith v. United Press International, 320 F.2d 219, 223 (2d Cir. 1963).[27] In

24. 28 U.S.C. § 1332. The complaint also alleged, of course, that the matter in controversy exceeded the requisite jurisdictional amount.

25. In a memorandum opinion, the Supreme Court reversed the decision of this Court of Appeals, saying that it was "of the opinion that the District Court correctly found there was proper service upon the defendant * * *." 350 U.S. at 1003, 76 S.Ct. at 648. However, this does not mean that the principle of law applied was erroneous, but merely that the result reached was disapproved. To reason otherwise would be to say that the Supreme Court, by a memorandum opinion, had overruled (or, at least, distinguished) Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947), and Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), language of which has not infrequently been relied upon for the view

that state law is applicable to the question of personal jurisdiction in diversity cases. See, Haas v. Fancher Furniture Company, 156 F.Supp. 564, 566 (E.D. Ill.1957); contra: K. Shapiro, Inc. v. New York Central R. Co., 152 F.Supp. 722, 725 (E.D.Mich.1957).

26. See, e. g., K. Shapiro, Inc. v. New York Central R. Co., 152 F.Supp. 722 (E.D.Mich.1957); Gayle v. Magazine Management Co., 153 F.Supp. 861 (M.D. Ala.1957); Paragon Oil Company v. Panama Refining and Petrochemical Co., 192 F.Supp. 259 (S.D.N.Y.1961) (questionable authority now since Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963)); Houston Fearless Corporation v. Teter, 318 F.2d 822 (10th Cir. 1963); 1 Moore's Federal Practice 1497–1500 (¶0.142 (5.–3)).

27. Arrowsmith reviews the cases in every circuit that has considered the issue, an-

any event, accepting the aforementioned rule as the proper and better rule, it follows therefrom that if state courts would not regard a particular foreign corporation as "doing business" in the state so as to be subject to their jurisdiction, a federal district court sitting in that state and hearing a diversity of citizenship case should likewise rule that the corporation is not "doing business" so as to be subject to its jurisdiction.

██ The applicable law of Illinois is found at Subsections (1) (a) and (3) of Section 17 of the Illinois Civil Practice Act of 1955,[28] which read:

"(1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State *as to any cause of action arising from the doing of any of said acts:*

"(a) The transaction of any business within this State;

\*　\*　\*　\*　\*　\*

"(3) *Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.*" (Emphasis supplied.)

Affidavits were attached to the railroad's motion to dismiss filed in the district court indicating the nature and scope of its rather limited, but apparently regular and continuous, activities in the State of Illinois. But without going further, and irrespective of the degree to which the railroad was doing business in Illinois, it is abundantly clear and, indeed, uncontroverted that appellant's cause of action against the railroad did not arise out of any of the business activities carried on in Illinois. This being so, Section 17 of the Illinois Civil

Practice Act, and particularly Subsection (3) thereof, would compel the courts of Illinois to find that the St. Louis-San Francisco Railroad Company, under these facts, was not "doing business" in that state in the sense that it was not subject to process or personal jurisdiction therein. Accordingly, the railroad was not amenable to process or the jurisdiction of the district court sitting in Illinois. In our case, the district court below was correct in granting the railroad's motion to dismiss for that reason.

██ While we have affirmed the ruling of the district court in the action against the railroad on the basis of the record in that court (i. e., the railroad's motion to dismiss), there is another compelling reason precluding appellant from bringing suit against the railroad on the employment contract. The very fact that appellant sought first to submit to the National Railroad Adjustment Board the question of the validity of his discharge precludes him, upon an adverse determination there, from seeking damages for wrongful discharge and breach of contract in a court of law thereafter. This was the explicit holding in Union Pacific R. Co. v. Price, supra, 360 U.S. 601, at 617, 79 S.Ct. 1351, 1360, wherein the Supreme Court said:

" \* \* \* To say that the discharged employee may litigate the validity of his discharge in a common-law action for damages after failing to sustain his grievance before the Board is to say that Congress planned that the Board should function only to render advisory opinions, and intended the [Railway Labor] Act's entire scheme for the settlement of grievances to be regarded 'as wholly conciliatory in character, involving no element of legal effectiveness, with the consequence that the parties are entirely free to accept or ignore the Board's decision \* \* \* [a conten-

---

alyzes the arguments pro and con, and overrules on this point the case of Jaftex Corporation v. Randolph Mills, Inc., 282 F.2d 508 (2d Cir. 1960), theretofore con-

sidered prominent authority to the contrary.

28. § 17(1) (a) and (3), Ch. 110, Ill.R.S. (1957).

tion] inconsistent with the Act's terms, purposes and legislative history.' Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 720–721 [65 S.Ct. 1282, 1288, 89 L.Ed. 1886]."

Therefore, appellant could not have maintained this action against the railroad in the district court below, or in any other court.

The judgment is

Affirmed.

SWYGERT, Circuit Judge (dissenting in part).

I am impelled to dissent from that part of the majority opinion relating to the reviewability of the order of the National Railway Adjustment Board.

The plaintiff was not denied procedural due process in the proceeding before the Board. But in addition to procedural due process he was entitled to substantive due process.

The Board's decision rested upon an interpretation of Article 40 of the collective bargaining agreement, which provided that in a disciplinary proceeding an accused employee "shall be permitted to examine all witnesses * * * pertaining to the case." Thus the contract stipulated, clearly and unambiguously, that the railroad was required to afford its employees one of the basic rights of a fair hearing—the right of confrontation. There was no room for an alternative interpretation. Yet the Board interpreted the provision to include only those witnesses "under the control or direction of the carrier," thereby excusing the nonappearance of the only witness who had firsthand knowledge of the charge against the plaintiff. This was an impermissible interpretation because it denied the plaintiff the very right that the contract unequivocally guaranteed him. The Board's ruling was arbitrary, capricious, and unreasonable. As a consequence, the plaintiff was denied substantive due process. In such circumstance, the courts are authorized to review the action of the Board. Union Pac. R.R. v. Price, 360 U.S. 601, 616, 79 S.Ct. 1351 (1959).