Adam J. **WESTERMAYER** et al.,
Plaintiffs,

v.

The **PULLMAN COMPANY** and Sheet Metal Workers' International Association, et al., Defendants.

No. 72 C 2927.

United States District Court,
N. D. Illinois, E. D.

June 20, 1973.

632

James P. Holloran, of Sommers & Holloran, St. Louis, Mo., for plaintiffs.

Edward J. Hickey, Jr., and William J. Hickey, Mulholland, Hickey & Lyman, Washington, D. C., Alex Elson, Elson, Lassers & Wolff, Chicago, Ill., for defendant Union.

Hamilton Smith and James E. Betke, of McDermott, Will & Emery, Chicago, Ill., for defendant Pullman.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the defendant unions' motion to dismiss the complaint or in the alternative for summary judgment on their behalf and on the defendant Pullman Company's motion to dismiss.

This is an action based on the alleged wrongful discharge of employees by a carrier and the failure of labor unions to adequately represent their members in violation of the Railway Labor Act, 45 U.S.C. § 151 et seq.

The plaintiffs in this action are former employees of the Pullman Company ("Pullman") who worked in St. Louis, Missouri until their furlough from such employment in 1968, and performed the

maintenance and repair on passenger cars and equipment used by Pullman in the performance of parlor and sleeping car services for most of the nation's railroads. This action is brought in the names of eight individuals for themselves and allegedly on behalf of additional former Pullman employees said to be similarly situated. The defendants are Pullman, the plaintiffs' former employer, which is a carrier under the Railway Labor Act; and six international and national railway labor organizations described as the collective bargaining representative of plaintiffs during the time they were so employed by Pullman.[1]

The following background facts are important to the proper disposition of the instant motions.

Until the end of 1968, Pullman performed sleeping and parlor car services under a so-called Uniform Services Contract approved by the Interstate Commerce Commission for most of the passenger carrying railroads of the country utilizing in such services Pullman owned passenger cars. The maintenance and repair of this Pullman equipment was performed by Pullman shop craft employees at various locations throughout the nation, including St. Louis, Missouri.[2]

The Transportation Act of 1958 authorized the Interstate Commerce Commission to permit discontinuances of passenger train operations by interstate rail carriers. After passage of this Act it became evident that the number of passenger trains whose operations were being, and would be, discontinued, would substantially reduce the need for a number of Pullman employees engaged in the performance of work in various crafts and classes generally established within the railroad industry, including shop craft employees. During this same period a number of the railroads were withdrawing from their contracts with Pullman, and performing their own sleeping car services.

On January 26, 1966, the Federation[3] and Pullman entered into an agreement under which shop craft employees of

---

1. The labor organization defendants are:
Sheet Metal Workers' International Association (SMW)
International Brotherhood of Electrical Workers (IBEW)
International Brotherhood of Firemen and Oilers (IBF & O)
International Association of Machinists and Aerospace Workers (IAM)
Brotherhood of Railway Carmen of the United States and Canada (BRC)
International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (IBB & B).

2. On January 1, 1969 all of the nation's railroads which continued sleeping car services took over such operations. Most of Pullman's employees were permitted to follow their work and became employees of the railroads by a prior agreement negotiated between shop crafts and other railway labor organizations and the railroads. Shop craft work by Pullman employees continued on a reduced volume until approximately September, 1969 (see the Affidavit of Robert E. Duckworth).

3. During the relevant period the Brotherhood of Railway Carmen of the United States and Canada ("Carmen") and the

International Brotherhood of Electrical Workers ("IBEW") [jointly referred to as "Brotherhoods"] were the collective bargaining representatives under the Railway Labor Act, 45 U.S.C. § 151 et seq., for the eight named plaintiffs (see Affidavits of Webb and De Gregorio). Five of said plaintiffs were formerly members of and represented by Carmen and three were members of and represented by IBEW. Such representation was furnished through national officers of the Brotherhoods in conjunction with the members of System Federation No. 122 ("Federation") and the Railway Employee's Department, AFL–CIO ("Department"). The Brotherhoods are the collective bargaining representatives for a number of other railroad employees performing similar duties as employees of the nation's railroads. The Brotherhoods and the other four (4) union defendants comprise the membership of the Department. The Federation was composed of other members of the defendant unions, each of whom had been elected as General Chairmen by Pullman employees, including plaintiffs who were members of one of the six shop craft unions.

Pullman were to be protected in their employment by being given the right to become employees of a railroad taking over operation of Pullman's sleeping car services with equal pay, seniority, vacations and other benefits formerly provided them as employees of Pullman.

An agreement was negotiated on July 19, 1966, by the Federation with Pullman to provide for protection of wages, rules, and working conditions of employees who would be required to "follow their work" with Pullman to new locations in order to retain Pullman employment.

After execution of the July 19, 1966 agreement, it became evident that the reduction in sleeping car service by the railroads would not provide for absorption of shop craft employees of Pullman, who desired to follow their work to railroad employment under the provision of the 1966 agreement.[4] The July 1966 agreement, furthermore, provided no protection as to wages or for separation allowances for employees whose services were not required by Pullman as a result of the decline in the volume of operations continued by it.

Accordingly, on September 16, 1968, the Federation served a Section 6 notice (45 U.S.C. § 156) under the Railway Labor Act on Pullman requesting modification and amendment of the July 1966 agreement so as to provide for severance pay-separation allowances to those shop craft Pullman employees not able to follow their work and become employees of the railroads under the January 1966 agreement, and who were no longer needed by Pullman, and thus would ultimately lose all employment. This notice

sought to amend the July 19, 1966 agreement and resolve the controversy.[5]

A number of conferences were held thereafter by representatives of Pullman and the Federation without reaching an agreement. A strike vote was taken and the strike ballots disclosed an almost unanimous vote in favor of a withdrawal from service if the efforts of the Federation were unsuccessful in negotiating an acceptable agreement. At the same time, and as provided for by the Railway Labor Act, the Department acting on behalf of the Federation, requested the assistance of the National Mediation Board to mediate the dispute.[6] On or about November 27, 1968 mediation by the National Mediation Board ("Board") had failed to bring about an amicable settlement and the Board's request for arbitration pursuant to Section 8 of the Railway Labor Act, 45 U. S.C. § 158, was declined by one of the parties. The Board gave notice that as of November 29, 1968 its services at resolving the controversy were terminated pursuant to the Act.

As provided by Section 6 of the Act, the employees and Pullman were required to maintain the *status quo* in employment conditions for a further 30 day period from termination of mediation services by the Board, but subsequent to that date (after December 29, 1968) would be permitted to resort to what is commonly referred to as "self-help". The Federation informed Pullman that it was setting December 31, 1968 as a strike date, but on December 12, 1968 upon being advised by Pullman representative Boechelman that such a strike date would not afford him sufficient

4. By October 30, 1968, a majority of railroads had notified Pullman that effective January 1, 1969, they would take over and operate their own sleeping car services. The Federation was so advised by Pullman.

5. The Federation sought to amend the 1966 agreement by adding the following provision:

"Notwithstanding anything to the contrary contained in the Agreement of

July 19, 1966 said Agreement shall be amended to provide that all employees who are in service on October 19, 1968 will, if furloughed, be entitled to a separation allowance, computed on the basis of the schedule set forth in Section 9 of the Washington Job Protection Agreement." (See Duckworth Affidavit).

6. See Duckworth Affidavit.

time to consult with and obtain the views of the railroads who were the owners of Pullman on the proposed agreement, the Federation changed the strike date to January 17, 1969. On January 13, 1969, and because of the imminence of the January 17 strike date, "hard" negotiations resumed, and were completed on January 16, 1969. In these final negotiations, Pullman representative Boechelman refused to agree to a protective date retroactive to October 17, 1968, insisted upon a more "current" date, and indicated an effective date of January 1, 1969, might be acceptable to Pullman's owning railroads.

Using January 1, 1969 as the effective date of the agreement meant that all Pullman shop craft employees in active service as of that date, if later furloughed by Pullman, would receive separation allowances. The Federation was aware that this effective date for the agreement meant that all Pullman shop craft employees in active service on that date, when later furloughed by Pullman, would receive separation allowances. The Federation was aware that an effective date of October 17, 1968 would provide for separation allowances to 630 Pullman shop craft employees; that approximately 70 of such employees had been furloughed by Pullman during the period October 17 and December 31, 1968; that an additional 45 such employees had been furloughed by Pullman on January 10, 1969; and that the cost to Pullman of paying separation allowances to 560 shop craft employees—or those in active service on January 1, 1969—would approximate, by defendant's estimate, six million dollars. The Federation voted to accept the January 1, 1969 effective date unless a further compromise could be reached with Pullman. The further efforts by the Federation to have the agreement provide for an earlier effective date were unsuccessful and the agreement was executed by the Federation and Pullman on January 16, 1969.[7]

The gravamen of plaintiffs' complaint is that they were unlawfully deprived of severance pay because the 1969 agreement between the Federation and Pullman on behalf of all Pullman shop craft employees required that a Pullman shop craft employee be in active service on January 1, 1969 to be entitled to receive severance pay when ultimately furloughed by Pullman. Plaintiffs contend that the active service qualifying date should have been October 17, 1968, which date was sought unsuccessfully in the negotiations between Federation and Pullman. The eight named plaintiffs were furloughed by Pullman during the period October 17 and December 31, 1968.[8]

---

7. See Duckworth Affidavit.

8. The individually named plaintiffs and the group of former Pullman employees said to be represented by them are the same plaintiffs who in 1971 brought a similar action against Pullman. In that action, which was filed in the Circuit Court of the City of St. Louis and removed to the United States District Court for the Eastern District of Missouri, Eastern Division, plaintiff alleged in somewhat similar terms to those in the instant complaint that the 1969 agreement was unlawful and in violation of the provision of the Railway Labor Act, 45 U.S.C. § 151 et seq. See Westermayer v. Pullman, 331 F.Supp. 328 (E.D. Mo.), Case No. 71 C 225. In an opinion entered August 17, 1971, the Honorable H. Kenneth Wangeline, writing for that court, dismissed without prejudice for lack of jurisdiction the complaint then filed by plaintiffs. Judge Wangeline found that the plaintiffs had not alleged exhaustion of their administrative remedies.

In their present complaint, plaintiffs, seeking to cure the pleading deficiency found in their former complaint, now, in part, allege that they were wrongfully discharged, and reiterate their former contention that the defendant unions through their agents and General Chairmen, conspired with Pullman so as to ignore the will of their members and enter into the unlawful agreement with Pullman. The unions have here been added in this action as defendants (see Paragraphs 8, 9, and 10 of the Complaint).

The defendant unions in support of their motion to dismiss or in the alternative for summary judgment contend:

1. The Court has no jurisdiction to interpret and apply the provisions of collective bargaining agreements, or to reform the same, or to adjudicate disputes arising thereunder and grant damages for violation of such agreements.

2. The Court has no jurisdiction to entertain an action against the Brotherhoods because of the failure of plaintiffs to exhaust administrative remedies provided by the Brotherhoods.

3. The defendant unions have not violated any duty owed to the plaintiffs to fairly represent them in grievances against Pullman concerning severance pay or otherwise.

4. The complaint's conclusory allegation of conspiracy between defendants to deprive plaintiffs of the benefits of the 1969 agreement is shown to be without factual support, to be refuted by the undisputed relevant material facts of the dispute, and is not an issue properly before the Court.

The plaintiff in opposition to the defendant unions' motion contends that the same motion was filed in the District Court from whence this cause was transferred, was denied by that court, and thus should be denied by this Court. Further, the plaintiffs contend that the complaint adequately states a cause of action against all of the defendants.

The defendant Pullman, in support of its motion to dismiss, contends:

1. Plaintiffs are barred by *res judicata* from asserting that this Court has subject matter jurisdiction over the controversy because the plaintiffs filed in Missouri a virtually identical complaint against Pullman, which was dismissed for lack of subject matter jurisdiction. See Westermayer, et al., v. Pullman Co., et al. [331 F. Supp. 328], (E.D.Mo.) Case No. 71 C 225.

2. The complaint fails to state a claim upon which relief can be granted.

The plaintiffs in opposition to the defendant Pullman's motion again contend that this same motion was filed in the District Court from whence this cause was transferred, was denied by that court, and thus should be denied by this Court.

It is the opinion of this Court after examining the pleadings that this Court lacks jurisdiction at the present time over the instant complaint.

I. IT IS NOT WITHIN THIS COURT'S PECULIAR JURISDICTION TO INTERPRET, APPLY OR REFORM THE PROVISIONS OF COLLECTIVE BARGAINING AGREEMENTS OR TO ADJUDICATE DISPUTES ARISING THEREUNDER.

 It is well established that grievances or disputes arising out of and concerning the interpretation or application of collective bargaining agreements between railroads and their employees may not be resolved by the courts, but must be submitted to a system of compulsory arbitration as set forth in Section 3 of the Railway Labor Act, 45 U.S.C. § 153. Brotherhood of Railroad Trainman v. Chicago River Indiana Railroad Company, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Diamond v.

---

This action was initially filed by plaintiffs in the U. S. District Court for the Eastern District of Missouri, Eastern Division. Responsive to the suggestion by Judge Webster of that court, plaintiffs requested that the case be transferred to this Court in whose jurisdiction service of process could be obtained on all the defendants. Prior to the transfer of the cause, Judge Webster entered an order denying a motion for summary judgment filed on behalf of the defendant unions. It is the opinion of this Court that such a ruling by a court which expressly does not have jurisdiction over the whole case cannot have a *res judicata* effect on any motion made by the parties in this Court action.

Terminal Ala. State Docks, 421 F.2d 228 (5th Cir. 1970); Brotherhood of Railroad Trainmen v. Denver and Rio Grande Western Railroad Company, 370 F.2d 833 (9th Cir. 1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456; Order of Railroad Conductors & Brakemen v. Spokane P & S Ry. Company, 366 F.2d 99 (9th Cir. 1966), cert. denied, 385 U.S. 1025, 87 S.Ct. 752, 17 L. Ed.2d 673. "Minor" disputes arising out of interpretations and application of collective bargaining agreements between railroads and their employees are entrusted solely and exclusively to the jurisdiction of the National Railroad Adjustment Board, 45 U.S.C. § 153, First, and other similar boards authorized to be established pursuant to Section 3, Second, of the Railway Labor Act, 45 U.S.C. § 153, Second. Gunther v. San Diego Arizona Eastern Ry., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965); Brotherhood of Railroad Trainmen v. Chicago River Indiana Railroad Company, *supra*. As specifically set forth in Section 3, Second, 45 U.S.C. § 153, Second, the awards of such arbitration boards are final and binding upon the parties to the dispute, and not reviewable on their merits by Federal District Courts.

■ "Major" disputes go first to mediation; then, if that fails, to acceptance or rejection of arbitration; and finally to possible presidential intervention. If all this fails, compulsory processes are at an end and either party may resort to self-help. See Brotherhood of Trainmen v. Toledo P & W Ry. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944); Butte, Anaconda & P. Ry. Co. v. Brotherhood of L. F. & E., 268 F.2d 54 (9th Cir. 1959).

■ There is no jurisdiction in the Federal District Courts to entertain an action for common law damages for an alleged breach of such a contract or for a collateral attack upon the validity of any decision reached thereon by a properly authorized arbitration board. Un-

ion Pacific Railroad Co. v. Price, 360 U. S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959); Edwards v. St. Louis-San Francisco R. Co., 361 F.2d 946 (7th Cir. 1966); Diamond v. Terminal Ry. Ala. State Docks, *supra*.

■ It is clear from the pleadings that the plaintiffs have failed to exhaust or even initiate their contractual remedies to determine the validity of their right to receive separation allowances and have not alleged any reason for their failure to so act.

■ The fact that the plaintiffs characterize their claim as one for "wrongful discharge" does not save it from the Railway Labor Act's mandatory provision for the processing of grievances. See Andrews v. Louisville & Nashville Railroad Company, 406 U.S. 320, 92 S. Ct. 1562, 32 L.Ed.2d 95 (1972). Thus the complaint should be dismissed based on the plaintiffs failure to adequately state a cause of action and by their failure to initiate or exhaust their contractual remedies.

II. THIS COURT HAS NO JURISDICTION TO ENTERTAIN AN ACTION AGAINST THE UNIONS OR PULLMAN BECAUSE OF THE PLAINTIFFS' FAILURE TO EXHAUST THEIR ADMINISTRATIVE REMEDIES.

The defendant unions have submitted affidavits to the effect that their respective constitutions provide for a complete and orderly procedure for the resolution and disposition of any charge brought by a member who believes he has been aggrieved by any act or omission on the part of his union, any of its officers or other members. The affidavits further state that each plaintiff as a member of his Brotherhood is required as a condition of his membership to comply with the provision of his constitution and that none of the plaintiffs filed a claim or grievance with his Brotherhood as to any action or omission on the part of his Brotherhood, its officers or members.[9]

---

9. See the Affidavits of Webb and De Gregoria.

Plaintiffs do not allege that they have resorted to and exhausted their available internal union remedies, and they do not state any reason for having failed to do so. Although the plaintiffs allege that their interests were not properly handled by their unions, plaintiffs do not contend that they at any time complained to their unions of any act or omission of a duty by any officer or other member of the unions with respect to representation of the interests of plaintiffs. Plaintiffs, as members of the defendant unions, are bound by the provisions of their constitutions, and are now barred from the institution of legal action against the defendant unions without exhaustion of their internal union remedies. IAM v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958).

The Federal Courts have uniformly held that they do not have the right to interfere with the internal management of a union or to entertain an action seeking redress of any alleged wrong by a union against a member thereof in the absence of a showing that the alleged aggrieved member has first exhausted available union remedies, or at least sought to do so. Tunstall v. Brotherhood of Locomotive Engineers, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); Neal v. System Board of Adjustment, 348 F.2d 722 (8th Cir. 1965); Fingar v. Seaboard Airline Railroad Co., 277 F.2d 698 (5th Cir. 1960); Jackson v. Chrysler, 78 L.R.R.M. 2745 (S.D.Ind. 1971); Smith v. CPC Int'l., 72 L.R.R.M. 2846 (N.D.Ill.1960).

A railway employee who feels that he has been unjustly discharged may use various administrative remedies provided by collective bargaining agreements subject to this chapter and his right of review before the National Railroad Adjustment Board; or he may sue the employer for damages without exhausting his contract and administrative remedies if action is brought in state court which would allow such action without prior exhaustion provided that he accept his discharge as final. Belan-ger v. New York Central Railroad Co., 384 F.2d 35 (6th Cir. 1967). The term "exhaustion of administrative remedies" in its broader sense may be an entirely appropriate description of the obligation of both the employee, the union and the carrier under the Railway Labor Act to resort to dispute settlement procedures provided by that Act. See Andrew v. Louisville & Nashville Railroad Company, *supra*.

Thus the instant complaint should be dismissed because this Court presently lacks jurisdiction over the instant controversy since the plaintiffs have failed to exhaust or even initiate their contractual and administrative remedies and have not alleged any reason for their failure to so act.

Accordingly it is hereby ordered that the defendant unions' and Pullman's motion to dismiss is granted.